**In re REVCO D.S., INC. et al., Debtors.**

**Bankruptcy Nos. 588–1305, 588–1308, 588–1321, 588–1761 to 588–1812 and 588–1820.**

United States Bankruptcy Court, N.D. Ohio.

July 24, 1990.

John Silas Hopkins, III, Baker & Hostetler, Cleveland, Ohio, for debtors.

Stuart E. Hertzberg, Pepper, Hamilton & Scheetz, Detroit, Mich., for Unsecured Trade Creditors' Committee.

Conrad Morgenstern, Cleveland, Ohio, U.S. Trustee.

Brad Eric Scheler, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Unsecured Noteholders' Committee.

Robert J. White, O'Melveny & Myers, Los Angeles, Cal., for Unofficial Committee of Secured Bank Lenders.

Richard Lieb, William J. Rochelle, Kronish, Lieb, Weiner & Hellman, New York City, for Unofficial Preferred Equity Committee.

Frederick M. Luper, Luper, Wolinetz, Sheriff & Niedenthal, Columbus, Ohio, for Odd Lot Trading, Inc. Creditors Committee.

John R. Lee, S.E.C., Chicago, Ill.

Barry L. Zaretsky, Kelley, Drye & Warren, New York City..

FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION TO COMMENCE SUIT FILED BY NEW YORK LIFE INSURANCE COMPANY

HAROLD F. WHITE, Bankruptcy Judge.

On July 20, 1990, a hearing was held in this Court on the "Motion of New York Life Insurance Company and New York Life Insurance and Annuity Corporation for Authority to Commence Suit Derivatively on Behalf of Revco Against Various LBO Participants, and for Relief from the Automatic Stay to Permit New York Life to Commence Suit Directly Against Various LBO Participants" (the "Motion") [Relief from Stay Docket ("Docket") No. GG–1]. Due notice of said hearing was provided to all parties pursuant to the administrative orders entered in these proceedings. Among those present at the hearing were counsel for New York Life Insurance Company and New York Life Insurance and Annuity Corporation ("New York Life"), the Debtors, the Official Committee for Unsecured Trade Creditors and Unsecured Noteholders, Professor Barry Lewis Zaretsky and the Unofficial Committee of Secured Bank Lenders.

*Background*

On July 26 and July 28, 1988 and October 4 and October 5, 1988, Revco D.S., Inc. and substantially all of its subsidiaries including the subsidiary Odd Lot corporations, (collectively the "Debtors") filed for protection under chapter 11 of the Bankruptcy Code. On April 24, 1990, this Court confirmed the plan of reorganization for the Odd Lot corporations.

To date no disclosure statement or plan of reorganization has been filed with this Court for the Revco corporations. This Court has granted Debtors four (4) extensions on the period of exclusivity in which only Debtors may file a disclosure statement and plan of reorganization. At present, July 31, 1990, is the due date for Debtors to file a disclosure statement and plan of reorganization. Debtors have filed a motion to extend the exclusive period until October 31, 1990, this motion is pending with the Court and set for hearing on July 24, 1990. (Main Case Docket No. 1777).

On September 23, 1988, the U.S. Trustee ("UST") filed a motion for appointment ("Motion for Appointment") of an examiner pursuant to 11 U.S.C. § 1104(b)(2) to investigate the 1986 leveraged buyout transaction of the Debtors (the "LBO"). The LBO was effected through a series of corporate transactions wherein Anac Holding Corporation ("Anac") acquired Revco D.S., Inc., a Michigan corporation ("Old Revco"). In addition, Revco D.S., Inc. became a Delaware corporation. On October 24, 1988, this Court denied the Motion for Appointment and found that the request of the UST was "premature". The UST appealed that order to the district and circuit courts.

The Sixth Circuit issued a decision reversing this Court's order and ruled that when the requirements of 11 U.S.C. § 1104(b)(2) are met and upon request of a party in interest or the UST, the Bankruptcy Court *shall* order the appointment of an examiner.

On June 14, 1990, after expedited notice and hearing, this Court entered an order approving the UST's appointment of Professor Barry Lewis Zaretsky as examiner (the "Examiner") (Main Case Docket No. 1722). The UST's appointment was filed and set for expedited hearing upon the agreement of all parties in interest in these proceedings. Counsel for the Debtors and all the creditor constituencies were present at the hearing and expressed their approval of the Examiner.

The Court was urged by all parties present that the Examiner be approved at this time as there was limited time for him to conduct the LBO investigation as it was necessary that a report be filed on or before July 17, 1990.

As the appointment of the Examiner came before the Court on an expedited basis, this Court approved the appointment on recommendation of the UST, the Debtors and the Committees.

The Order approving appointment of the Examiner provided:

> The Examiner shall investigate potential causes of action and other remedies arising out of the leveraged buyout and the attendant benefits and detriments to the estates of Revco, D.S., Inc. and Anac Holding Corporation associated with pursuing any such causes of action and other remedies, and shall prepare a written statement of investigation regarding the desirability of pursuing any alleged causes of action found and other remedies. Additionally, the Examiner shall conduct any further investigation he deems appropriate after notice and hearing and after Court approval.

Order Approving Appointment of Examiner, p. 2, (Main Case Docket No. 1722).

* The report is published as an appendix.

On July 16, 1990, the Examiner filed his preliminary report on his investigation (the "Report"). (Main Case Docket No. 1823).*

New York Life filed the Motion on June 27, 1990. In the Motion, New York Life seeks an order authorizing it to commence and prosecute a lawsuit derivatively, (and double derivatively), in the name of and on behalf of Revco D.S., Inc. ("Revco") and its parent, Anac against various defendants asserting various claims for relief arising out of the LBO. This Court scheduled the hearing on the Motion on July 10, 1990. At the request of the Trade Committee the hearing was adjourned until after the Examiner filed his Report. By agreement of all parties, the hearing on the Motion was scheduled for July 20, 1990.

Based upon the evidence presented, being the Report and testimony of three witnesses called by New York Life, this Court makes the following Findings of Fact.

*Findings of Fact*

1. This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334 and General Order No. 84 of the Northern District of Ohio. Venue is proper in this district pursuant to 28 U.S.C. § 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2. To date no disclosure statement or plan of reorganization has been filed in the Revco cases.

3. The potential Michigan corporate statutory causes of action arising out of the LBO from the Michigan Business Corporation Act (the "Michigan Act"), effective in 1986, expire on July 25, 1990. Report, pp. 496–97, 509. The statute of limitations on other causes of action arising out of the LBO expire in late 1990 and no sooner than November 1990. *Id.*, at 496–97.

4. Possible causes of action analyzed under the Michigan Act by the Examiner include sections 351 (improper dividend or distribution), 365 (improper share repurchase), 551(1)(a) (directors' liability for un-

lawful payment or distribution), and 551(3) (shareholder liability). Report, pp. 504–09.

5. New York Life called three witnesses, Harold Herzog, a member of the Board of Directors of Revco and Anac, Boake A. Sells, chief executive officer of Revco and a member of the Board of Directors of Revco and Anac, and the Examiner.

6. The Board of Directors of Revco and Anac consist of the same members. Two members of the Board of Directors were selected by New York Life.

7. The Board of Directors consists of members with emphasis in financial rather than retail business.

8. The Examiner testified and recommends in the Report that litigation not be commenced prior to the expiration of the statute of limitations for the Michigan Act claims. *See*, Report, pp. 479, 480 and 504.

9. The Report states at page 504:

The Examiner has reviewed the Michigan Act as it existed in 1986 and concludes that claims could be stated under the Michigan Act against directors and shareholders of Old Revco. Nevertheless, because of the difficulty of meeting the burden of proof, the uncertainty of achieving a substantial recovery, the fact that little if any incremental benefit is offered over a fraudulent conveyance action, and an adverse effect on plan negotiations would likely result if litigation were commenced, the Examiner concludes that the Michigan actions should not be pursued.

10. The Examiner concluded that "substantial obstacles exist in sustaining an action and recovering damages against Old Revco's former officers and directors" under section 551(1)(a) of the Michigan Act. Report, p. 508. Section 551(1)(a) of the Michigan Act provides that directors who vote for dividends or distribution of assets to shareholders contrary to the Michigan Act without adequately providing for the corporation's known debts and obligations are jointly and severally liable to the corporation for the benefit of its creditors and shareholders to the extent of a legally recoverable injury, up to the amount of the unlawful payment or distribution. Report, pp. 506–07.

The statute specifically provides, however, that a director or officer is not liable under this section if he complied with section 541 of the Michigan Act.

Section 541 of the Michigan Act states:

A director or an officer shall discharge the duties of that position in good faith and with that degree of diligence, care and skill which an ordinarily prudent person would exercise under similar circumstances in a like position. In discharging his or her duties, a director or an officer, when *acting in good faith, may rely upon the opinion of counsel for the corporation, upon the report of an independent appraiser selected with a reasonable case [sic] by the board, or upon financial statements of the corporation represented to him or her as* correct by the president or the officer of the corporation having charge of its books of account, *or stated in a written report by an independent public or certified public accountant or firm of accountants fairly to reflect the financial condition of the corporation.*

(emphasis added.)

The Examiner concluded that it would be extremely difficult to prove that the directors and officers of Old Revco, did not comply with section 541(1) of the Michigan Act. He further noted that a number of factors indicate that Old Revco's Board of Directors acted in good faith and with due care in determining the LBO was in the best interests of Old Revco:

including, *inter alia,* that (i) the Board appointed the Independent Committee to evaluate the Merger, (ii) the Independent Committee met frequently over an eight month period and was continually advised by Fried Frank and Goldman Sachs, two entities which have extensive experience and eminent reputations in mergers, acquisitions and buyouts, (iii) the Independent Committee received a fairness opinion from Goldman Sachs, (iv) the Independent Committee received a "negative" comfort letter from Peat

Marwick, and (v) the Independent Committee had several months in which to review the proposal.

Report, p. 507.

The Examiner also concluded, "on a more practical level, the Examiner has been advised that no directors' and officers' liability insurance is in effect covering the officers and directors for such claims. Thus, it is doubtful that a recovery sufficiently substantial to justify the effort, expense and burdens associated with litigation could be obtained." Report, p. 508.

11. The Examiner testified that he conferred with several prominent Michigan law firms who advised him that recovery against the Old Revco Board of Directors had little legal merit and likelihood of success because it appears the Board relied in good faith on its financial advisors and counsel when considering the LBO. Report, p. 507.

12. The Examiner testified and concluded in his Report that due to the doctrines of *res judicata* and collateral estoppel, if the Michigan Act actions are brought, the litigants would have to bring all actions based on the same set of facts at the same time. He states in his Report, "if litigation under the Michigan Act were commenced by July 25, 1990, such litigation would need to include all fraudulent conveyance and state law tort claims. It is the Examiner's belief that such massive litigation would be difficult, if not impossible, to control and could lead to intransigence on the part of parties negotiating a plan, as well as to unforeseen developments." Report, p. 480.

13. The Examiner reported that during the course of transactions leading to consummation of the LBO, Old Revco agreed to pay all fees and expenses incurred by entities involved in the LBO and to indemnify them against most liabilities arising therefrom. As a result of this agreement, New York Life Insurance Company received a commitment fee of $1,176,471 and New York Life Insurance and Annuity Corporation received a commitment fee of $588,235. Report, p. 493.

14. New York Life offered no evidence of the specific terms of the mandatory redemption provision of the Preferred Stock or the Report which discusses the participation of New York Life in the LBO. *See,* Report, pp. 489–90 and 493.

15. The Examiner also concluded "there is little reason to pursue potential causes of action against shareholders under the Michigan Act". (Section 551(3) of the Michigan Act). Report, p. 509. In support of his conclusion, the Examiner explained that (a) the statute is unclear as to what level of knowledge a shareholder must have to be liable, *Id.* at 508; (b) there are no Michigan cases on point, *Id.;* (c) the ability to recover from shareholders is questionable, *Id.* at 508–09; (d) in order to maintain such an action successfully, a court would have to apply Michigan law in a manner "for which there does not seem to be any clear precedent" *Id.;* and finally (e) "an action under the Michigan Act would involve a greater burden of proof than a fraudulent conveyance action, and would yield no greater recovery for the estate." *Id.* The Examiner also noted that such an action could have an adverse effect on on-going plan negotiations.

16. The Examiner determined that there would be little detriment to the estates in failing to bring an action under the Michigan Act because (i) there is no increment benefit to the estates of successful litigation, (ii) the applicability of the Michigan Act to the Revco LBO is questionable, and (iii) the burden of proof under the Michigan Act is extremely difficult compared to the level of proof required to establish a fraudulent conveyance. Report, p. 481.

17. Boake A. Sells, the chief executive officer of Debtors, testified that on July 18, 1990, the Board of Directors of Revco and Anac met for approximately four hours and considered legal action under the Michigan Act and determined and decided to take no action regarding the LBO, at this time, for the following reasons:

(a) the Board was advised by corporate and bankruptcy counsel (who consulted with Michigan counsel) that the likelihood of success under the Michigan Act against

directors and stockholders would be very doubtful because of the business judgment rule and section 541 of the Michigan Act as it pertains to officers and directors in conducting affairs of the corporation; the Board also considered the recommendation of the Examiner in his Report; and,

(b) litigation would be disastrous to the retail business and Revco, which at this time, is now operating successfully; such litigation would further tie up and prevent Revco's management from devoting their time and efforts to Revco's business and plan of reorganization.

18. Boake A. Sells agreed with the Report as filed.

19. New York Life claims to own, in the aggregate, $75 million of senior preferred stock of Anac (the "Preferred Stock") and appears to have participated in the LBO as the Preferred Stock was purchased on December 29, 1986, in connection with the LBO transaction. For some years prior to that date, New York Life had provided long-term financing to Revco. At the time of the LBO, these loans totalled $30 million. New York Life agreed to acquire the Preferred Stock in exchange for the outstanding $30 million of Revco notes it then held plus an additional $45 million in cash.

20. Responses in Opposition to the Motion were filed by the Noteholders and Trade Committees (Docket Nos. GG–5 and GG–8, the Banks and Debtors (Dockets No. GG–11 and GG–13). New York Life filed a Reply Memorandum (Docket No. GG–15).

21. New York Life did not offer any additional evidence to support their position for filing this action at this time on behalf of Revco.

## Issue

Has New York Life presented sufficient evidence to bring a derivative action under the Michigan Act and whether failure to bring the case is detrimental to the estate?

*Conclusions of Law*
The Motion

New York Life presents two grounds for the relief requested. First, New York Life asserts the Michigan Act claims of the Debtors will be time barred on July 25, 1990. Second, New York Life asserts Revco and Anac have repeatedly refused its demands to bring actions on these claims and that unless such action is brought valuable assets of the Debtors estates will be lost or abandoned unlawfully. Motion, p. 2.

In the alternative, New York Life requests relief from the automatic stay pursuant to § 362(d) of the Bankruptcy Code so that New York Life may assert all its direct claims against the LBO participants without violating the provisions of the automatic stay. *Id.*[1]

A draft of the proposed derivative complaint is attached to the Motion as Exhibit A. New York Life also asserts that the Debtors' estate should bear all the expenses of New York Life in prosecuting the LBO litigation.

New York Life seeks authority to commence the LBO action based on claims under the Michigan Act and other state causes of action. Pursuant to a review of the pleadings and the Report the Michigan Act claims are the only potential claims wherein the relevant statute of limitations will expire on July 25, 1990. All other claims will expire no sooner than November 1990. The Court will address New York Life's request to commence litigation only on the Michigan Act and related claims.

The Court finds New York Life's request to commence suit on all other claims is premature. The Board of Directors of Revco and Anac still have time to consider whether or not to commence litigation on causes of action other than the Michigan Act.

*State Fraudulent Conveyance Actions*

The principal subject of investigation in these cases has been the potential cause of

---

**1.** On July 18, 1990, New York Life filed a Reply Memorandum (Docket No. GG–15) wherein it withdrew the portion of the Motion seeking relief from stay.

action based on the contention that the LBO was a fraudulent conveyance. The Anac and Revco chapter 11 cases were filed on July 28, 1988. The LBO cannot be challenged as a fraudulent conveyance under the Bankruptcy Code because it occurred more than one year before the chapter 11 cases were filed. 11 U.S.C. § 548(a). For that reason, attention has always focused on state fraudulent conveyance law.

The applicable state law is the Uniform Fraudulent Conveyance Act as enacted in Ohio. Ohio Rev.Code §§ 1336.01–1336.12, Report, pp. 499–500.

*Michigan Act and Related Causes of Action*

The Michigan Act causes of action are claims for breach of fiduciary duty by directors and officers of Old Revco and claims against the directors of Old Revco for making, and against the stockholders of Old Revco for receiving, improper dividends or distributions in the LBO. The statute of limitations on the Michigan Act causes of action appears to be three years. Report, p. 509. The three-year period ended on December 28, 1989. The Michigan Act causes of action belonged to Revco when these chapter 11 cases were filed. The statute of limitations was therefore extended until two years after the order for relief by section 108(a)(2) of the Bankruptcy Code, 11 U.S.C. § 108(a)(2). Thus, the statute of limitations on the Michigan Act causes of action will expire on July 25, 1990. Report, p. 510. No party disputes this proposition.

### Standing

The responding parties assert that New York Life lacks standing to prosecute or benefit from a fraudulent conveyance action, as New York Life is an "equity holder" and only "creditors" may prosecute or benefit from such actions.

New York Life asserts it is a creditor as defined in § 101(9)(A) of the Bankruptcy Code pursuant to the mandatory redemption provisions of the Preferred Stock and by reason of its claims for fraud in connection with its purchase of the Preferred Stock.

New York Life further asserts that it does not seek to assert fraudulent conveyance court action in its own right, but rather to prosecute derivatively Revco's claims. New York Life's Reply, p. 16.

*Standing to Bring State Fraudulent Conveyance Actions*

■ This Court concludes that New York Life's assertion that it is a "creditor" for purposes of prosecuting state fraudulent conveyance actions is unfounded.

New York Life relies on *In re St. Charles Preservation Investors, Ltd.*, 112 B.R. 469 (D.D.C.1990) for the proposition that the holder of mandatorily redeemable preferred stock is a "creditor". Such reliance is misplaced as the facts of *St. Charles* can be easily distinguished from the instant case. In *St. Charles* the court reviewed a class of limited partners' rights to guaranteed interest payments on their invested capital as provided in the partnership agreement. The court ruled that guaranteed interest payments provided in the partnership agreement conferred "creditor" status on the partners.

The holding in *St. Charles* is inapplicable to the instant case because mandatory redeemable preferred stock lacks the feature of the guaranteed interest payments which were the basis of the court's ruling in *St. Charles.*

Generally, the rights of shareholders to redeem stock are not guaranteed but are dependent on the financial solvency of the corporation. Accordingly, the mandatory redemption provision of convertible preferred stock is an interest and not a claim as New York Life asserts. *See, In re Joshua Slocum, Ltd.*, 103 B.R. 610, 623 (Bankr.E.D.Pa.1989).

■ New York Life's argument that it is a subordinated creditor of both Anac and Revco by reason of its claims for fraud in connection with the purchase of the Preferred Stock is unfounded and will not confer "creditor" status on New York Life. Pursuant to 11 U.S.C. § 510(b) any claim of New York Life regarding the purchase of its Preferred Stock would not rise above

the level of an equity interest of the Preferred Stock.

This Court concludes that New York Life is not a "creditor" of Revco or Anac, but rather an equity holder and therefore has no standing to prosecute a state fraudulent conveyance action. Ohio Rev.Code §§ 1336.01–.12.

*Standing to Bring Michigan Act and Other Claims*

■ The Banks, Noteholders and Trade Committees assert that New York Life is unqualified to pursue any LBO actions because New York was an active investor in the LBO and received $1.8 million in commitment fees in connection with the purchase of the Preferred Stock and $30 million as payment on a pre-existing indebtedness on December 29, 1986. New York Life responds that those facts do not give rise to any "conflicts of interest" or disabilities which would interfere with prosecution of the claims.

This Court concludes that New York Life is not the proper party to bring such claims as it appears, at this time, it was an active LBO participant and is not accountable to any other constituency in these chapter 11 proceedings.

It appears that New York Life was part of the investor group which acquired Old Revco in the LBO. New York Life contributed $75 million for the purchase of Preferred Stock and received $1.8 million in commitment fees. (Finding Nos. 13 and 19). The transfers made by Old Revco, the subject of any potential LBO claims, were clearly made for the benefit of New York Life. If any LBO claims were successful and the transfers by Old Revco could be avoided, New York Life itself, as an entity for whose benefit such transfers were made, would be liable for the value of the property transferred under § 550(a) of the Bankruptcy Code. The draft complaint attached to the Motion fails to state any actions against New York Life for its participation in the LBO. Because of the apparent history of New York Life as a participant in the LBO New York Life's ability to attack the LBO today is tainted. Therefore, this Court concludes that New York

Life lacks standing to bring any LBO actions.

*Derivative Suit Requirements*

■ Bankruptcy Rule 7023.1 provides that "Rule 23.1 Fed.R.Civ.P. applies in adversary proceedings." Fed.R.Civ.P. 23.1 provides in pertinent part:

> The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association.

Fed.R.Civ.P. 23.1.

The Sixth Circuit Court of Appeals has addressed the "fairness and adequacy" requirement under Rule 23.1 and stated: "the representative plaintiff must have no antagonistic interests that will prevent him from fairly and adequately representing the interests of the similarly situated shareholders" and "Certain outside entanglement may make it likely that the interests of other shareholders will be disregarded." *Owen v. Modern Diversified Industries, Inc., et al.,* 643 F.2d 441, 443 (6th Cir.1981).

The Sixth Circuit Court emphasized:

> The nature of the shareholder derivative action is fiduciary. In *Cohen [v. Beneficial Loan Corp.,* 337 U.S. 541, 548, 69 S.Ct. 1221, 1226–27, 93 L.Ed. 1528], the Supreme Court wrote: "Likewise, a stockholder who brings suit on a cause of action derived from the corporation assumes a position not technically as a trustee perhaps, but one of a *fiduciary character.* He sues, not for himself alone, but as representative of a class compromising all who are similarly situated. The *interest of all* in the *redress of the wrongs are taken into his hands,* dependent upon his diligence, wisdom and integrity." (emphasis added).

*Owen, supra,* at 444.

In *Owen* the Circuit Court affirmed a district court's dismissal of a derivative complaint as the plaintiff did not "fairly and adequately represent the shareholders." The plaintiff held a de minimis number of shares of stock and a substantial

amount of debentures in the corporation. The district court found a "strong probability that this derivative action will be used merely as a device to obtain leverage in negotiations with the corporation concerning the plaintiff's debentures." *Id.* at 443. The district court found plaintiff's interest in his stock will give way to his interest in receiving a full recovery on his debentures. In affirming the district court's dismissal of the derivative complaint the Circuit Court stated, "Owen's *de minimis* equity investment, when coupled with his substantial debt investment in the defendant corporation creates an interest adverse to the interests of other shareholders." *Id.* at 444.

In applying the principles of *Owen* to the instant case it is apparent to this Court that New York Life has such "antagonistic interests" and "outside entanglements" to prevent it from "fairly and adequately" representing the interests of the shareholders and creditors it purports to represent. Such an entanglement is illustrated by the fact that New York Life was an active participant in the LBO and is a potential defendant in any fraudulent conveyance action; (Finding Nos. 13 and 19) and, New York Life, an equity holder of Anac, proposes to maintain a double derivative lawsuit against most of the creditors of the Debtors.

For this reason, New York Life cannot satisfy Rule 23.1 in that it "must have no antagonistic interests" which would interfere with its fairly and adequately representing those very creditors which are named defendants in the derivative complaint.

New York Life's own interest suggest that from its standpoint the impetus for the derivative suit would be as a bargaining tool to force the Debtors to include New York Life in plan negotiations. (*See,* New York Life's Reply Memorandum, "To date, the debtors in possession and other parties in interest have excluded New York Life and a preferred shareholder class from active or meaningful participation in the negotiations." p. 6, and "The filing of the Derivative Complaint cannot be said to be an impediment to the conduct of the good faith negotiations once the other parties recognize that they must negotiate a consensual plan that includes New York as a negotiating party." p. 8). Such a use would prove contrary to the interest of creditors and the entire Debtors' estate, which New York Life purports to represent in the derivative suit. *See, G.A. Enterprises, Inc. v. Leisure Living Communities, Inc.,* 517 F.2d 24, 26 (1st Cir.1975).

In summary, New York Life lacks standing to bring the proposed derivative suit as it is not an adequate representative of the creditors and cannot satisfy the fair and adequate representation requirement of Rule 23.1 and Bankruptcy Rule 7023.1

■ Assuming, *arguendo,* that New York Life did have standing to bring a derivative action, this Court concludes that New York Life has failed to demonstrate to this Court that Debtors failure to prosecute the Michigan Act and related claims is unjustifiable and therefore does not grant New York Life authority to prosecute the actions.

■ "The exclusive power to commence avoidance actions vested in trustees and debtors-in-possession is permissive rather than mandatory and the exercise of this power can only be reviewed for abuse of discretion." (case citations omitted) *Hansen v. Finn (In re Curry and Sorensen, Inc.),* 57 B.R. 824, 828 (Bankr.App. 9th Cir.1986). A debtor-in-possession has a substantial degree of "prosecutorial discretion" to commence litigation on behalf of the estate. *In re V. Savino Oil and Heating Co., Inc.,* 91 B.R. 655, 656 (Bankr.E.D. N.Y.1989).

■ Decisions on whether or not to commence litigation rests with the business judgment of the Debtors. *United States ex. rel. Peoples Banking Co. v. Derryberry (In re Hartley),* 50 B.R. 852, 863 (Bankr. N.D.Ohio 1985).

A creditor has several remedies if dissatisfied with lack of action on the part of debtor-in-possession, "[T]he creditor may move to replace the debtor-in-possession with a Chapter 11 trustee; or to convert

the Chapter 11 case to one under Chapter 7; move to dismiss the Chapter 11 case; or petition the court to compel the debtor-in-possession to act or to gain court permission to institute the action itself. *See, Matter of Monsour Medical Center, supra,* 5 B.R. 715, at 718." (Bkrtcy.W.Pa.1980) *Curry,* at 828.

■ As a general rule a single creditor lacks the authority to institute an avoidance action on behalf of the debtors. *Savino,* at 657 *Curry and Sorensen,* at 824. The *Savino* court on page 657, noted that a showing of "particularly extraordinary circumstances" would dictate that such authority might be granted to an individual creditor.

In order for New York to bring an LBO action for the debtors, New York would have to demonstrate to this Court that the Board of Revco acted unjustifiably in declining to sue on the Michigan Act claims. It is apparent to this Court, from the testimony at the hearing, that the Board of Directors, including the two members designated by New York Life, carefully considered this issue on July 18, 1990 and exercised its business judgment and decided not to commence litigation on the Michigan Acts. (Finding No. 17) The Board consists of members with a sophisticated background in finance and business. (Finding No. 7) In making the decision not to commence litigation on the Michigan Acts the Board considered the advice of its legal and financial experts and the conclusion and recommendation of the Examiner not to pursue litigation under the Michigan Act. [Finding No. 17(a)] The Board further determined that such a lawsuit at this time could be "disastrous" to the business operations of the Debtors. [Finding No. 17(b)]

It is apparent to this Court that the Board carefully considered whether or not to commence litigation on the Michigan Act and after its consideration and analysis exercised its business judgment not to pursue said action.

As New York Life has failed to demonstrate that the Board of Directors acted "unjustifiably" in not commencing suit on the Michigan Acts, this Court will not grant its request for authority to commence the derivative actions.

Accordingly, for the foregoing reasons, this Court concludes that the Motion shall be denied. These Findings are entered in accordance with the oral findings and ruling made by this Court at the hearing on the Motion on July 20, 1990.

APPENDIX

PRELIMINARY REPORT OF EXAMINER PROFESSOR BARRY LEWIS ZARETSKY

July 16, 1990

## TABLE OF CONTENTS

| | Page |
|---|---|
| I. PRELIMINARY STATEMENT | 479 |
|    A. Expiration of Statute of Limitations on July 25, 1990 | 480 |
|    B. Fraudulent Conveyance Litigation | 481 |
|    C. Dworkin Unwind | 483 |
|    D. Other Causes of Action | 484 |
|    E. Summary of Recommendations | 484 |
| II. METHODOLOGY | 485 |
| III. SUMMARY OF FACTS | 486 |
|    A. Background to Revco LBO | 486 |
|    B. Pre–LBO Capital Structure | 488 |
|    C. Revco LBO Structure | 488 |
|       1. Parties to Transactions | 488 |
|         (a) Anac | 488 |
|         (b) Anac Acquisition Corporation ("Acquisition") | 490 |
|         (c) Merger Sub | 490 |

Page

    2. Steps to the Transaction........................................ 490
    3. Bank Debt...................................................... 491
    4. Fees, Expenses and Indemnification ........................... 493
  D. Operational Changes .............................................. 494
  E. Post–LBO Events ................................................. 494
  F. Dworkin Unwind.................................................. 495
    1. Payments and Transfer to Dworkins and Edwards.............. 495
    2. Payments and Transfer to Dworkins .......................... 496
IV. STATUTES OF LIMITATIONS ....................................... 496
  A. Section 546 of the Bankruptcy Code ............................. 497
  B. Section 108 of the Bankruptcy Code ............................. 498
  C. Statutes of Limitations on State Causes of Action................. 499
    1. Fraudulent Conveyance Claims............................... 499
    2. Claims Other Than Fraudulent Conveyance ................... 500
V. CHOICE OF LAW ISSUES ......................................... 500
  A. Analysis.......................................................... 501
    1. Tort, Including Fraudulent Conveyance Claims................. 501
    2. Contract Claims ............................................. 503
    3. Equitable Relief ............................................. 503
    4. Business Corporation Claims ................................. 503
  B. Federal Bankruptcy Law .......................................... 504
VI. CLAIMS UNDER MICHIGAN ACT ................................... 504
  A. Improper Dividend or Distribution ............................... 504
  B. Improper Share Repurchase ...................................... 506
  C. Remedies......................................................... 506
    1. Against Directors ........................................... 506
    2. Against Shareholders ........................................ 508
    3. Statute of Limitations ....................................... 509
    4. Res Judicata and Collateral Estoppel ......................... 509
VII. FRAUDULENT CONVEYANCE ISSUES ............................... 510
  A. Introduction ...................................................... 510
  B. Leveraged Buyouts as a Fraudulent Transfer ..................... 510
    1. Applicability of Law in General .............................. 510
    2. Application of Fraudulent Conveyance Law to the Revco LBO ... 513
  C. Remedies in a Fraudulent Conveyance Action ..................... 516
    1. Analysis by Components...................................... 518
    2. Analysis of the Substance of the Revco LBO.................. 520
    3. Another Approach to Analyzing Substance over Form ........... 522
VIII. EQUITABLE SUBORDINATION ..................................... 524
IX. OTHER CAUSES OF ACTION ...................................... 525
  A. Dworkin Unwind.................................................. 525
  B. Recovery of Fees as Fraudulent Conveyances ..................... 527
  C. Other Professional Liability Claims ............................... 528
  D. Destruction of Documents......................................... 528
X. FACTS YET TO BE REVIEWED ................................... 528
XI. CONCLUSION..................................................... 529

By Order dated June 14, 1990 (the "Order"), the United States Bankruptcy Court for the Northern District of Ohio (the "Court") approved the appointment by the Conrad J. Morgenstern, United States Trustee of Professor Barry Lewis Zaretsky as the Examiner in these cases. The Examiner was directed to investigate potential causes of action and other remedies arising out of the 1986 leveraged buyout ("Revco LBO") of Revco D.S., Inc., a Michigan corporation ("Old Revco"), and to consider the attendant benefits and detriments to the estates of Revco D.S., Inc., a Delaware corporation, debtor and debtor-in-possession herein ("Revco"), and Anac Holding Corporation, a Delaware corporation, debtor and debtor-in-possession herein ("Anac"), associated with pursuing any such causes of action and other remedies. Among other things, the Order directed the Examiner to file at least a preliminary writ-

ten report of his investigation pursuant to 11 U.S.C. section 1106(a)(4) on or before July 16, 1990. This document is the Examiner's Preliminary Report as required by the Order.

## I. PRELIMINARY STATEMENT

The Examiner was appointed to investigate potential causes of action and other remedies arising from the Revco LBO and to analyze the benefits and detriments of pursuing any available claims. Upon his appointment the Examiner, in conjunction with his professional advisors, immediately began soliciting the views of representatives of every significant party in interest in the case and attempting to collect and review the documents pertinent to the Revco LBO. Ultimately, the Examiner amassed hundreds of thousands of pages of relevant documents, many of which the Examiner was not able to review in the short time since his appointment. In reaching preliminary conclusions, the Examiner took into account a wide spectrum of opinion concerning both the viability of various causes of action arising from the Revco LBO and the corresponding benefits and detriments to the estate of pursuing any actions.

While the Examiner believes that he has had an opportunity to consider the opinions of every significant constituency in the case, there are still many more parties with whom the Examiner wishes to speak. In addition, more formal discovery will be necessary to finalize any conclusions, and the Examiner will need additional time to complete his review of the comprehensive set of documents that have been made available to him. Finally, the Examiner must have the assistance of his own independent financial advisor to assist him in formulating various theories and reaching his conclusions. Thus, the Examiner must emphasize the preliminary nature of the conclusions set forth in this Report and reserves the right to amend or expand these preliminary conclusions in a subsequent report.

At this point, the Examiner has preliminarily concluded that viable causes of action exist against a broad panoply of defendants under both fraudulent conveyance and other legal theories. Subject to the verification of the Examiner's financial advisors (whom he is presently seeking court approval to retain), the Examiner believes that the remedies for such causes of action could create a solvent estate. However, given the current state of the law, obtaining such remedies would be arduous, time-consuming and expensive. Concern has been expressed that extensive litigation would destroy the business of Revco. The Examiner believes, however, that if pursuing these causes of action becomes necessary, this fear can be mitigated by preserving the causes of action in a litigation trust and confirming a plan of reorganization.

The Examiner has approached this matter bearing in mind that the spirit of the Bankruptcy Code is consensus. It is the hope of the Examiner that by setting forth the potential causes of action in this Preliminary Report, the Examiner will show the way for the parties to negotiate a consensual plan of reorganization which would settle many of the claims. The Examiner strongly believes that it would be in the best interests of the estates for the parties to develop a consensual plan of reorganization which takes into account the various potential liabilities and recoveries under the theories set forth in this Report. In this regard, the Examiner notes with approval that there reportedly has been substantial progress toward the negotiation of a consensual plan since the appointment of the Examiner. Nevertheless, there is still a long way to go. The Examiner believes that no lawsuit should be brought at this time which could interfere with the negotiation process; however, for the reasons set forth below, the Examiner believes that if the estates are not close to confirming a consensual plan by November of this year, the causes of action represent too valuable an asset of the estates to be ignored, and litigation should then be commenced. In his next report, the Examiner will elaborate on the appropriate parties to commence the litigation and the proper targets.

In furtherance of the above philosophy, the Examiner has reached several prelimi-

nary conclusions which are summarized here and discussed more fully in the body of this Preliminary Report.

### A. *Expiration of Statute of Limitations on July 25, 1990*

The Examiner has determined that the time in which to commence certain state law causes of action expires on July 25, 1990. The most significant of these are potential causes of action under the Michigan Business Corporation Act in effect at the time of the Revco LBO (the "Michigan Act"). In addition, the Examiner has concluded that due to the doctrines of *res judicata* and collateral estoppel, if such actions are brought, the litigants would need to bring all actions based on the same set of facts at the same time. Thus, if litigation under the Michigan Act were commenced by July 25, 1990, such litigation would need to include all fraudulent conveyance and state law tort claims.

It is the Examiner's belief that such massive litigation would be difficult, if not impossible, to control and could lead to intransigence on the part of parties negotiating a plan, as well as to unforeseen developments. At present, it appears that the appointment of an Examiner has had an *in terrorem* effect upon the parties in interest. Several major constituencies have informed the Examiner that they have made significant strides in the last few weeks toward negotiating a consensual plan of reorganization which would settle the various causes of action without the need for costly, lengthy litigation. The Examiner is extremely reluctant to derail these negotiations at this time. Against the obvious detriment to these negotiations of bringing litigation at this time, however, the Examiner weighed the potential benefits which would be lost to the estates if litigation were not commenced. The Examiner has concluded that the benefits to the estates of the current plan negotiations and the possibility of a consensual plan outweigh the detriments to the estates of foregoing certain state law claims. Consequently, the Examiner recommends that litigation not be commenced prior to the expiration of the statute of limitations for the Michigan Act claims. The Examiner bases this recommendation on the following.

The primary causes of action which must be brought prior to July 25, 1990, are claims under sections 351 and 365 of the Michigan Act. Those sections prohibit a Michigan corporation from declaring and paying dividends, making distributions in cash to its shareholders, or purchasing or redeeming its shares if the corporation was at the time or would thereby be rendered insolvent, and from declaring dividends or paying distributions from other than surplus of the corporation. The Michigan Act was violated if the payment to Old Revco shareholders in the Merger (as hereinafter defined) was considered either a "distribution," "redemption" or "purchase" and Old Revco was rendered insolvent thereby, or, if a "distribution," it was not made out of surplus.

There are substantial questions of law as to whether the cash paid to Old Revco shareholders in the Merger constitutes a "distribution," "purchase" or "redemption" as required for enforcement of these provisions of the Michigan Act. The Examiner has been provided with copies of analyses by eminent Michigan law firms which have disagreed as to the applicability of sections 351 and 365 to mergers. These analyses confirm that there is a substantial question of law as to whether these statutes apply. Moreover, the application of the statutes to the Revco LBO would require the Court to reach a result which has not yet been reached in any reported case.

In addition, the remedies under the Michigan Act do not appear to the Examiner to provide significantly meaningful incremental benefits on a practical level over those which could be obtained through a successful fraudulent conveyance action. Since *res judicata* and collateral estoppel principles require that a fraudulent conveyance action be brought at the same time, and since the estates are in any event only entitled to a single satisfaction, there would be a limited net benefit to the estates in bringing an action under the Michigan Act.

Finally, in comparing the burdens of proof under the Michigan Act with the burden under the applicable fraudulent conveyance statute, the Examiner notes, as does a recent Michigan case, that the burden of proof under the Michigan Act is, if anything, much more difficult to sustain than is the burden under the fraudulent conveyance law. The Michigan Act appears to require affirmative evidence of the knowledge and state of mind of shareholders, whereas a state law fraudulent conveyance action arguably would not.

The Examiner does not see any net detriment to the estates in failing to bring an action under the Michigan Act because (i) there is no incremental benefit to the estates of successful litigation, (ii) the applicability of the Michigan Act to the Revco LBO is questionable, and (iii) the burden of proof under the Michigan Act is more difficult than the level of proof required to establish a fraudulent conveyance.

In reaching this conclusion, the Examiner is mindful that the Michigan Act specifically provides for a cause of action against officers and directors who authorize an improper distribution, and that the statute of limitations for an action under state law against officers and directors of Old Revco for breach of fiduciary duty will also expire on July 25, 1990. By failing to bring an action prior to July 25, 1990, the estates may lose the ability to proceed against the Old Revco officers and directors.

There is a likelihood, however, that the officers and directors would be protected by the Michigan version of the business judgment rule, as codified in section 541 of the Michigan Act. Furthermore, the Examiner has been advised, although he has not yet been able to verify independently, that there is no applicable officers and directors' liability insurance to fund a judgment. While the Examiner has not had an opportunity to examine the net worth of any officers and directors, the Examiner believes it would be unlikely that any officer or director could fund a substantial portion of a judgment in excess of $1 billion. Thus, due to the likelihood that the officers and directors are shielded by the

business judgment rule, and the practical concern that even were the litigation successful, the officers and directors would not be able to fund a judgment, the Examiner is not persuaded that there would be any real detriment to the estates in foregoing litigation at this time.

For all of the above reasons, and as explained more fully in this Preliminary Report, the Examiner recommends that no action be commenced prior to July 25, 1990.

### B. *Fraudulent Conveyance Litigation*

The Examiner has given grave consideration to whether fraudulent conveyance causes of action exist as a result of the Revco LBO, and whether there is a benefit to the estates in bringing those claims. In approaching this issue, the Examiner has considered the facts at hand, the views of various constituencies to the case, the progress of plan negotiations, the position of management that prolonged litigation would destroy the business, the uncertain nature of existing law coupled with the view of certain eminent legal theorists who believe that fraudulent conveyance law should not apply to leveraged buyouts, the uncertainty and practical effects of available remedies, and the virtual certainty that litigation could be prolonged and exceptionally expensive.

The Examiner preliminarily has concluded that viable causes of action do exist which could provide a net benefit to the estates if the debtors are not able to confirm a consensual plan in the very near future. The Examiner will, however, need to review the financial affairs of the debtors more closely, with the help of a financial advisor, before finalizing this conclusion.

The essence of a fraudulent conveyance under the applicable state statute is a transaction made either (a) with actual fraudulent intent, or (b) without fair consideration if the debtor is rendered insolvent or is left with unreasonably small capital. Viewed in a macroeconomic sense and consistent with existing case law, Revco (including its predecessor, Old Revco) did not receive "fair consideration" for the trans-

fers and obligations incurred in the Revco LBO in that it served essentially as a conduit for the funds which went directly to the shareholders of Old Revco. In particular, Old Revco received no meaningful benefit from incurring obligations to the Banks (as hereinafter defined) or the holders of the Subordinated Notes (as hereinafter defined), or from encumbering its assets as security for the Banks and certain pre-LBO debt.

With respect to determining whether either debtor was rendered insolvent or left with unreasonably small capital by the Revco LBO transactions, the Examiner has not had the full benefit of his own financial advisor throughout the entire course of his investigation. As required by the Order, the Examiner has talked with each of the existing financial advisors in the case. Although the Examiner determined that he could not file a meaningful Preliminary Report without the assistance of a financial advisor, there was insufficient time to obtain court authority to retain an advisor. Consequently, after consulting with various parties in interest, the Examiner obtained the limited services of C.J. Lawrence, Morgan Grenfell Inc. ("Morgan Grenfell") to advise the Examiner on an emergency basis. Concurrently with filing this Preliminary Report, the Examiner is seeking authority to retain Morgan Grenfell *nunc pro tunc*. The Examiner will be in a better position to analyze the insolvency issues in his next report if the Court approves retention of a financial advisor. In the meantime, Morgan Grenfell has done a massive amount of work in a very short time on an emergency basis to assist the Examiner in reaching some preliminary conclusions.

On a preliminary basis, the Examiner believes that after considering the impact of various covenants under the Loan Agreements (as hereinafter defined) on the capital structure of Revco and taking into account the seasonality of Revco's business, Revco was left with insufficient capital to conduct its business. The Examiner also believes that projections used to support the analysis of the Revco LBO may not have been properly prepared. Reasonable projections based on the same assumptions as those used in projections made available to the Examiner would have shown that Revco was left with insufficient capital to satisfy its then known obligations. Moreover, Revco would have been unable to satisfy the covenants under the Loan Agreements (as hereinafter defined). The Examiner feels confident that further analysis of the capital structure will confirm these preliminary conclusions.

With respect to whether the Revco LBO rendered Revco insolvent, the Examiner notes that certain indicia of insolvency are present, and that, on an asset basis, it is certainly plausible that Revco was rendered insolvent by the Revco LBO. However, the Examiner needs to give these issues much further consideration and analysis before he is ready to reach even a tentative conclusion that Revco was rendered insolvent by the Revco LBO. From all that the Examiner has seen to date, however, he believes that there is a basis for proving the financial elements of a fraudulent conveyance. The Examiner recognizes, however, that the current state of the law does not leave it free from doubt that a party would prevail in such litigation even if the financial elements are successfully proven.

The Examiner also has given serious thought to the remedies that might be available in a successful fraudulent conveyance action. Since remedies are a matter of considerable contention among the various parties in interest, it is an issue which must be analyzed to determine ultimately the benefits to the estates of commencing litigation. While this is an uncharted area, the Examiner is developing theories of an equitable result which would in essence reorder the priority of the estates' debts and render the Revco estate solvent. This would enable the parties primarily injured by the Revco LBO to recover their claims plus interest. The Examiner believes that a remedy can be fashioned which would not require disgorgement by any party, making the litigation less intense and expensive. The Examiner's preliminary thoughts in this regard are included in this Preliminary

Report. However, since the remedies of a successful fraudulent conveyance action are largely virgin territory, this area requires further analysis by the Examiner before he can make more concrete recommendations as to either the targets or the remedies sought in fraudulent conveyance litigation.

Although the Examiner has concluded that it is not in the best interests of the estates to commence litigation on or before July 25, 1990, he has concluded that there is a risk that the statute of limitations on a fraudulent conveyance action could expire before the end of 1990. Commencement of litigation cannot be postponed indefinitely unless confirmation of a consensual plan appears in prospect. In this regard, the Examiner also notes that certain other tort claims will be lost to the estates in late 1990 if actions are not brought. The Examiner is also cognizant of the debtors' disappointingly slow progress toward a consensual plan and the overall contentious nature of this case.

After considering the likely remedies and recoveries, the Examiner preliminarily has concluded that if the debtors have not shown an ability to confirm a consensual plan or plans by November 1990, litigation should be commenced in order to avoid even the slightest risk of losing the fraudulent conveyance claims or other causes of action. The other actions under consideration which must be brought by the end of 1990 include actions for negligence, breach of duties owed to the debtors and breach of contract. While the Examiner is still looking into these various causes of action, a preliminary analysis suggests that these causes of action alone could return millions of dollars to the estates.

The Examiner has also concluded that the Revco LBO in and of itself is not the only fraudulent conveyance action available to the estates. At the time of the Revco LBO, nearly $80,000,000 in fees were paid to various professionals and the Banks. At first glance, it appears that these may have been grossly disproportionate to the benefit, if any, received by the debtors. It also appears that Revco paid considerable fees to professionals who only rendered services to Anac, the Banks or their respective representatives, and provided no equivalent benefit to Revco. The Examiner believes that there may be causes of action against various professionals and the Banks for recovery of fees, whether or not the Revco LBO in its entirety is attacked. Moreover, paydowns, extra interest and security interests were granted with respect to the Pre–Revco LBO 11⅛% Notes and Pre–Revco LBO 11¾% Debentures (each as hereinafter defined) to facilitate the Revco LBO. The Examiner is considering the merits of commencing litigation on the above matters even if the causes of action arising directly from the Revco LBO itself are settled through a consensual plan.

### C. *Dworkin Unwind*

Subsequent to the Revco LBO, Revco's senior management fell into disfavor. As a result, a transaction was entered into which is commonly referred to as the "Dworkin Unwind." This resulted in the severance of Sidney Dworkin, Mark Dworkin and William Edwards from executive positions at Revco and redemption of their Anac stock. As further detailed in this Preliminary Report, the Dworkin Unwind involved the upstreaming of assets from Revco so that Anac could redeem stock from the Dworkins and Edwards. It also involved prepayment of severance compensation. In addition to the possibility that Revco received no benefit for its payments, the assets distributed to the Dworkins by Anac may well have been disproportionate to the value of the stock.

As a result of the Dworkin Unwind, causes of action may exist against the Dworkins and Edwards for fraudulent conveyances, preferences and improper redemption of stock which could result in a recovery to the estates of 8–12 million dollars. The Examiner preliminarily has concluded that there would be value to the estate in bringing these causes of action and is examining further whether these causes of action should be brought separate and apart from any other causes of action involving the Revco LBO, or whether these actions might be used as the basis

of a litigation trust to aid in formulating a consensual plan of reorganization.

### D. *Other Causes of Action*

The Examiner preliminarily has reviewed numerous other causes of action arising from the LBO and subsequent operations of the business and believes there may be other viable causes of action which could be brought by the estates, including causes of action against various professionals. The Examiner also is reviewing whether the estates should be objecting to the claims of various parties as a result of the Revco LBO.

Whether the alleged destruction of records by certain professionals may be actionable also is being reviewed. The Examiner would need much more formal discovery to determine whether the latter is the case; however, facts have been suggested to the Examiner which, if true, would lead to the conclusion that reports and documents were improperly destroyed. The Examiner hopes that the debtors are looking into this matter also, because, if the facts indicate an improper destruction of records, those responsible should at the very least be expected to contribute to the funding of a consensual plan.

### E. *Summary of Recommendations*

The Examiner has reached the preliminary conclusion that viable causes of action that could substantially benefit the estates exist as a result of the Revco LBO. These include actions for fraudulent conveyance, state law tort claims, claims under the Michigan Act, and possible claims for preferences and illegal stock redemptions arising from subsequent transactions with Anac shareholders. In addition, the Examiner believes that potential causes of action against the various professionals for negligence, malpractice, breach of contract, breach of fiduciary duty and recovery of their professional fees need to be explored further, but also are likely. Other causes of action may prove viable as well, such as lender liability and an objection to claims procedure. The possible culpability of any party for the allegedly willful destruction

of important records also must be reviewed.

Although the remedies of a successful fraudulent conveyance litigation are uncertain, the Examiner believes that the courts could fashion an equitable remedy which would allow unsecured general creditors to be paid in full with interest at the expense of the parties who contributed to the fraudulent conveyance. It is likely that this burden would fall primarily upon the holders of the Subordinated Notes if the subordination provisions of various trust indentures are upheld. The Examiner has not yet had an opportunity to review the enforceability of the subordination provisions.

Against the potential benefits to the estates, which could become solvent as a result of these actions, and to the unsecured creditors, who would be paid in full with interest if the Revco estate becomes solvent, the Examiner has balanced the uncertainties created by the vagaries of the law in this area, the uncertainty of the remedies, the prolonged and costly nature of litigation and the possible detrimental effect on Revco's business. This balancing process has convinced the Examiner that it would be preferable for the parties to agree on a consensual plan of reorganization which takes into account the potential liabilities of targets of a fraudulent conveyance action and the potential benefits to various creditor groups. A consensual plan would preserve management and avoid costly, prolonged litigation. The Examiner feels that it is important for the parties to be able to have the opportunity to continue to negotiate a consensual plan, particularly since they have recently shown progress in doing so.

It is this balancing process, coupled with the Examiner's belief that a successful litigation under the Michigan Act would provide little net benefit to the estate, that has brought the Examiner to recommend that no litigation be brought under the Michigan Act prior to July 25, 1990. If the parties have not shown an ability to confirm a consensual plan by November 1990, however, the Examiner is likely to recommend

the commencement of fraudulent conveyance litigation and all the other attendant litigations.

The contentious nature of this case and the parties' inability to successfully negotiate a plan in almost two years causes the Examiner grave concern as to whether the parties will successfully negotiate a consensual plan. It has been suggested to the Examiner that the Revco Board as presently constituted, since it primarily represents equity, may be intransigent in proposing any plan which does not provide a substantial benefit to equity. To the Examiner's knowledge, no effort has been made to break the current deadlock by having parties who might have considerable liability in a fraudulent conveyance action contribute to the funding of a consensual plan. As a result, while the Examiner has observed that efforts to arrive at a plan of reorganization appear to have intensified since his appointment, considerable progress must still be made to bring this goal to fruition. Consequently, the Examiner suggests that the Court consider whether a mediator would be useful to expedite arriving at a plan of reorganization which can be confirmed and implemented quickly.

## II. METHODOLOGY

In preparing this Preliminary Report, the Examiner, his counsel and his financial advisor tried to obtain as much information as possible within the short time available. To accomplish that goal, the Examiner attempted, during the 33 days between his appointment and the date of this Report, to review as many documents, interview as many witnesses and conduct as much legal research and financial analysis as was feasible.

Immediately following his appointment, the Examiner began to obtain, review and catalogue the available documents. Between June 12 and the week preceding the filing of this Preliminary Report, the Examiner received more than one hundred thousand pages of documents from numerous sources, including the debtors, interested parties and public records. In addition, the Examiner had access to the documents filed with the Court and various 2004 examination transcripts. While the Examiner tried to review those documents he believed would best provide background and other crucial information, it was impossible to review and analyze even a majority of the documents. Moreover, even though the Examiner received thousands of pages, it quickly became apparent that other documents, in substantial but unknown quantities, remain to be produced.

Given the large number of individuals and organizations involved in the Revco LBO, the Examiner identified approximately 36 individuals or organizations he considered most important to interview before issuing his Preliminary Report. In these meetings the Examiner sought to obtain information about the Revco LBO and the prospects for successfully reorganizing the debtors.

The Examiner determined that the most effective way to complete the interviews in sufficient time to have any impact on this report was for the Examiner or his representatives to try to arrange interviews without the need for a subpoena. The Examiner is pleased to report that almost all individuals and organizations cooperated fully in this endeavor. The Examiner recognizes that without this cooperation it would have been difficult if not impossible to complete this Preliminary Report within the time allotted.

Of course, in analyzing a transaction as complicated as the Revco LBO, diverse disciplines and areas of expertise must be brought together and coordinated. Due to the enormous volume of materials and parties involved, the amount of information to be analyzed is truly massive. The Examiner was directed to prepare this Preliminary Report by July 16, approximately one month after his appointment. Consequently, a team approach was used in which several senior people heading up various aspects of the investigation joined the Examiner in conducting critical interviews. This senior team included individuals with expertise in bankruptcy, corporate and litigation areas. Because of the enormous

task which had to be accomplished in a highly abbreviated time period, this was the only effective method of assuring a proper, thorough and careful analysis.

The Examiner or his representatives spoke with the following, all of whom, with rare exception, were most cooperative and accommodating:

United States Trustee
Baker & Hostetler
Kronish, Lieb, Weiner & Hellman
Fried, Frank, Harris, Shriver & Jacobson
Benesch, Friedlander, Coplan & Aronoff
Weil, Gotshal & Manges
Deloitte & Touche
Pepper, Hamilton & Scheetz
O'Melveny & Myers
Coopers & Lybrand
Wells Fargo Bank, N.A.
Ernst & Young (Trade Committee)
Ernst & Young (Subordinated Noteholders)
Lazard Freres & Co.
Smith Barney, Harris Upham & Co., Inc.
Wachtell, Lipton Rosen & Katz
Arthur Andersen & Co.
New York Life Insurance Company
Rothschild Inc.
Levin Weintraub & Crames/Kaye Scholer
Boake A. Sells (Revco)
Gregory K. Raven (Revco)
Dean S. Haskell (Revco)
Glenn Golenberg (Golenberg & Co.; Revco director)
Charles M. Harr (Revco director)
Lee D. Powar, Esq. (former Revco director)
Nathaniel de Rothschild (former Revco director; Transcontinental Service Group, N.V.)
William Edwards (former Revco President)
Wilbur Smith (former Revco Treasurer)
Sidney Dworkin (former Revco Chairman)
R. Carroll Hudson (former Revco Chief Financial Officer)
James Wylie (former Salomon employee)

Among those the Examiner wanted to interview prior to issuing this Preliminary Report, but could not, due to scheduling difficulties, were Peat Marwick Main & Co., formerly Peat Marwick, Mitchell & Co. ("Peat Marwick"), and Sanford B. Noll, a former Old Revco director. In addition, the Examiner was unable to meet with Goldman, Sachs & Co. ("Goldman Sachs"), Malvin E. Bank of Thompson, Hine & Flory, and certain present and former Salomon employees.

At the risk of belaboring the point, the Examiner wishes to emphasize that he and his representatives believe that in the time they have been involved in the case, it has not been possible to perform a thorough review of the documents and the facts, or to have the Examiner's financial advisor perform the necessary analysis. Accordingly, it is important to recognize that the ongoing investigation may cause the Examiner to change some of his views in the Final Report.

### III. SUMMARY OF FACTS

Set forth below is a summary of the facts concerning the Revco LBO. The summary is not exhaustive, and is limited to facts derived from documentary sources or which appear uncontroverted based on discussions the Examiner or his representatives have had with individuals involved in the matter. In order to keep the summary succinct and fairly understandable, not all details and nuances of each aspect of the transaction are included. As the need arises, factual matters which are not described in this Summary are discussed elsewhere in this Preliminary Report.

#### A. *Background to Revco LBO*

Old Revco was originally formed as a Michigan corporation in 1956. Sidney Dworkin was, during all pertinent times prior to September 1987, Old Revco's Chairman and Chief Executive Officer.

In 1984, Old Revco acquired Odd Lot Trading, Inc. ("Odd Lot") from Bernard A. Marden and Isaac Perlmutter in consideration for the issuance of approximately 12% of Old Revco's common stock on a fully

diluted basis. Reportedly, a key motivating factor behind the transaction from Old Revco's perspective was that Old Revco perceived itself as a potential takeover target and Dworkin wanted to place a block of Old Revco shares in the hands of friendly investors. Additionally, some operational synergies and benefits were expected.

Within days after the closing of the Odd Lot acquisition, Marden and Perlmutter presented written charges of improper procurement practices on the part of Elliot Dworkin, one of Sidney Dworkin's two sons who worked for Old Revco. Those charges led to a controversial and acrimonious dispute and Elliot's eventual resignation. After considerable litigation and public recrimination, in 1985, Old Revco repurchased all of Marden's and Perlmutter's Old Revco stock.

In September 1985, Glenn Golenberg, Managing Director of Golenberg & Co., a Cleveland merchant banking firm, initiated meetings with Sidney Dworkin and William B. Edwards, Old Revco's President and Chief Operating Officer, concerning the possibility of a management leveraged buyout. During this period, Mr. Golenberg also initiated contacts with Salomon and Transcontinental Services Group, N.V., a publicly traded Netherlands Antilles corporation ("Transcontinental"), to obtain advice and financing for a leveraged buyout.

Beginning in the autumn of 1985, Salomon served as Anac's financial advisor and as underwriter and private placement agent for the securities issued to finance the Revco LBO. Until the December 1986 closing, Salomon's activities included: meeting and planning with Anac's principals; working with management to prepare projections, financial models and promotional material; negotiating the terms and documentation concerning all aspects of the financing; and marketing securities to investors.

In March 1986, Messrs. Dworkin and Edwards presented a proposal to Old Revco's Board of Directors pursuant to which an investor group (the "Investor Group") consisting of approximately 38 members of management (including Messrs. Dworkin and Edwards) (the "Management Investors"), Golenberg, Salomon and Transcontinental would acquire the entire equity interest in Old Revco through a merger transaction. Under this proposal each outstanding share of Old Revco common stock would be exchanged for $33 in cash and shares of preferred stock of a new company. The estimated market value of the stock was $3 per share. As part of the financing for this proposal, senior debt was to be provided through a nine-year term loan of $553,000,000 extended by a syndicate of banks to be organized by Wells Fargo Bank, N.A. ("Wells Fargo").

To respond to this proposal, the Board of Directors nominated a Special Independent Committee (the "Independent Committee") consisting of seven directors whose primary business affiliations were not with Old Revco. Pursuant to Board authorization, the Independent Committee retained Fried, Frank, Harris, Shriver & Jacobson ("Fried Frank") as legal counsel and Goldman Sachs as its financial advisor.

Shortly thereafter, Goldman Sachs was contacted by E.F. Hutton & Company, representing the Dart Group, concerning a possible acquisition of Old Revco. Discussions with the Dart Group terminated in May 1986 without reaching agreement.

In April 1986, the Independent Committee determined not to recommend acceptance of the proposal. According to the Independent Committee the terms then being offered, including the price per share and the fact that a portion of the consideration was to be paid other than in cash, were not in the best interests of shareholders.

During the spring and early summer of 1986, the Investor Group attempted to restructure the acquisition proposal. After Wells Fargo did not successfully complete the syndication of the financing, the Investor Group (mostly through Salomon) began negotiating with General Electric Credit Corporation ("GECC") for senior debt financing. The Examiner has been advised that negotiations with GECC were terminated because of GECC's insistence on receiving equity and on having Sidney Dworkin replaced as chief executive officer of

Revco. Accordingly, in the early summer of 1986, Salomon approached Wells Fargo to resume negotiations for bank financing. At that time, Wells Fargo began to work with Marine Midland Bank, N.A. ("Marine") as co-agent in order to complete the financing.

Eventually, in August 1986, the Investor Group made an alternate proposal to acquire Old Revco for an all cash price of $38.50 per share. The Independent Committee unanimously recommended that the Board of Directors approve this transaction. An Agreement and Plan of Merger (the "Merger Agreement") was executed in August 1986.

The Independent Committee met at least 17 times from March 20, 1986, through November 12, 1986. Present (in person or by telephone) at each meeting were representatives of Fried Frank and Goldman Sachs. According to its minutes, the Independent Committee explored a wide range of issues in great depth. The subject of the Revco LBO was also discussed at not fewer than seven meetings of the full Board of Directors in 1986.

## B. *Pre–LBO Capital Structure*

Prior to the Revco LBO, Old Revco was a corporation whose stock was widely held and traded on the New York and Midwest Stock Exchanges. It had approximately 36,000,000 shares of common stock outstanding, with no record holder owning as much as 5% of the stock at the time the Revco LBO proposal was made public.

As of June 1, 1985, Old Revco had long-term debt of approximately $48,000,000, consisting of approximately $13,000,000 of indebtedness related to industrial revenue bonds, $18,000,000 of unsecured notes payable to insurance companies, $15,000,000 of lease obligations and $2,000,000 of other notes payable. As of May 31, 1986, its long-term debt had increased to approximately $309,000,000. The material differ-

ences from the long-term debt picture of the previous year related to the issuance of approximately $125,000,000 of unsecured 11¾% sinking fund debentures due 2015 (the "Pre–LBO 11¾% Debentures"), $50,-000,000 of unsecured 11⅛% notes due 1995 (the "Pre–LBO 11⅛% Notes"), $60,000,000 of borrowings under a $75,000,000 revolving credit agreement with a syndicate of banks and the issuance of $25,000,000 of notes to insurance companies. The Indenture under which the Pre–LBO 11¾% Debentures and Pre–LBO 11⅛% Notes were issued required these securities be equally and ratably secured with any other subsequent secured debt of Old Revco. The additional long-term borrowings were incurred primarily to finance the repayment of short-term debt, the repurchase of the Old Revco common stock from Perlmutter and Marden, and the $35,000,000 acquisition of Carl's Drug Co., Inc.

## C. *Revco LBO Structure*

The series of transactions composing the Revco LBO closed over the two-day period of December 29 and December 30, 1986. While there are a number of steps and facts which do not appear terribly critical to an analysis of possible claims arising from the transactions, the elements necessary for a basic understanding of what transpired are summarized below.

### 1. Parties to Transactions

#### (a) *Anac*

The vehicle through which the Investor Group acquired Old Revco was Anac. Prior to the Revco LBO, Anac had minimal capitalization, and its sole shareholders were Sidney Dworkin and D.S. Partners, L.P. ("DSP"), a Bermuda partnership controlled by Transcontinental. After the first day of the closing on December 29, 1986, the holders of Anac common stock and their respective holdings were as follows:

| Investor | Investment | Number of Shares | % of Stock |
|----------|-----------|------------------|------------|
| DSP | $18,858,390 | 2,715,000 | 51.0 |
| Management Investors | 10,158,525 | 1,462,500 | 27.5 |
| Glenn Golenberg | 416,760 | 60,000 | 1.1 |

| Investor | Investment | Number of Shares | % of Stock |
|---|---|---|---|
| Jeffrey Golenberg (Glenn's Son) | $ 52,095 | 7,500 | .1 |
| Robert Golenberg (Glenn's Son) | 52,095 | 7,500 | .1 |
| Salomon Brothers Holding Company Inc. ("Salomon Holding") | 3,084,371 | 444,050 | 8.3 |
| Harbour Investments, Ltd. ("Harbour") | 1,760,464 | 253,450 | 4.8 |
| Public (issued in connection with the Units discussed below) | 2,604,750 | 375,000 | 7.0 |

In acquiring the common stock, the Management Investors paid an aggregate in cash of approximately $756,000, issued promissory notes of approximately $200,000 and transferred 238,867 shares of Old Revco common stock (the "Management Transfer Shares"). All other investors paid cash of $6.946 per share for their common stock.

The non-public holders of Anac's common stock entered into a Shareholders' Agreement. Among other things, it provided for the voting of their shares and required them to use best efforts to cause Anac and Revco to have the same Board of Directors after the Revco LBO.

Anac also issued three series of preferred stock. Most senior were 850,000 shares of 12% Convertible Preferred Stock (the "Convertible Preferred") issued at a price of $100 per share, resulting in net proceeds of $82,025,000. By the Convertible Preferred's terms, Anac is required to redeem 170,000 shares per year on each December 31, beginning December 31, 1997. The Convertible Preferred is convertible at any time into shares of Anac common stock at a designated conversion price. Morgan Guaranty Trust Company of New York, as Trustee ("Morgan Guaranty"), purchased 100,000 shares, New York Life Insurance Company ("NY Life") purchased 500,000 shares and New York Life Insurance and Annuity Corporation, a NY Life subsidiary ("NYLIAC"), purchased 250,000 shares of the Convertible Preferred. If these shares were converted to common stock, Morgan Guaranty, NY Life and NYLIAC would own, respectively, 3.4%, 17.1% and 8.5% of Anac's outstanding common stock on a fully diluted basis. While the investments of Morgan Guaranty and NYLIAC represented new cash coming into Anac, NY Life retired approximately $30,000,000 of outstanding debt due from Old Revco. Accordingly, NY Life appears to have invested approximately $20,000,000 additionally in the transaction.

A second series of Anac preferred stock junior to the Convertible Preferred is the 15.25% Cumulative Exchangeable Preferred Stock (the "Exchangeable Preferred"). An aggregate of 7,880,000 shares were sold to the public at $16.50 per share, for an aggregate of $130,020,000 and net proceeds of $124,819,200. By the terms of the Exchangeable Preferred, Anac has the option of paying dividends payable on or before December 15, 1991 in cash or additional shares of Exchangeable Preferred at a designated rate. Anac has the option to redeem, in whole or in part, the Exchangeable Preferred at the liquidation value of $25 per share (plus accrued dividends) after 1991, and is required to redeem it at that price through five annual sinking fund payments beginning on December 15, 1997. The Exchangeable Preferred is exchangeable at Anac's option for unsecured subordinated notes bearing interest at 15.25% per annum due on December 15, 2001. The Exchangeable Preferred was offered pursuant to a prospectus dated December 18, 1986 (the "Prospectus"), prepared in connection with an underwriting by Salomon. One institutional holder of the Exchangeable Preferred has stated that this stock was marketed by Salomon as a "junior debenture."

The third series of Anac preferred stock is the 17.62% Cumulative Junior Preferred Stock (the "Junior Preferred"), 1,203,871 shares of which were issued at a price of $25 per share (an aggregate of $30,096,775) to DSP, Salomon Holding and Harbour.

DSP acquired approximately 79.5% of the outstanding Junior Preferred, Salomon Holding approximately 13.0% and Harbour approximately 7.4%.

### (b) *Anac Acquisition Corporation ("Acquisition")*

Acquisition was a Delaware corporation formed as a wholly-owned subsidiary of Anac solely to facilitate the transaction. Acquisition was capitalized by Anac with approximately $265,000,000 cash and the 238,867 Management Transfer Shares. Acquisition owned directly and through six separate wholly-owned subsidiaries established for tax reasons (the "Mirror Subsidiaries") all of the outstanding stock of Anac Merger Corporation, a Michigan corporation ("Merger Sub").

### (c) *Merger Sub*

Merger Sub was initially capitalized with substantially all of the $265,000,000 used to capitalize Acquisition. Pursuant to the Prospectus, Merger Sub offered certain securities to the public. These securities consisted of:

1. $400,000,000 of 13.125% Senior Subordinated Notes due 1994 (the "Senior Subordinated Notes");

2. $210,000,000 of 13.30% Subordinated Notes due 1996 (the "13.30% Notes"); and

3. $93,750,000 of 13.30% Junior Subordinated Notes due 2001 (the "Junior Subordinated Notes"; the Senior Subordinated Notes, 13.30% Notes and Junior Subordinated Notes are sometimes collectively called the "Subordinated Notes").

The Senior Subordinated Notes and 13.30% Notes were issued at par. The Junior Subordinated Notes were issued as part of 93,750 units (the "Units"), each consisting of a Junior Subordinated Note in the principal amount of $1,000, four shares of Anac common stock and a right to put to Anac each of the four shares of Anac common stock purchased as part of the Unit prior to a certain time. The Units were sold for $1,000 each, for total gross proceeds of $93,750,000.

The Senior Subordinated Notes rank senior to the 13.30% Notes, which rank senior to the Junior Subordinated Notes. The three series, however, are subordinate to all obligations in connection with bank loans or credit (including principal, interest, fees and changes under the Loan Agreements referred to below), other public debt, and other indebtedness (as defined) of the issuer unless the instrument creating or evidencing the indebtedness provides that the indebtedness is not superior in payment to the Subordinated Notes. Accounts payable in the ordinary course of business (*i.e.*, trade debt) are expressly excepted from the definition of "Senior Indebtedness" for these purposes, and accordingly rank *pari passu* with the Subordinated Notes.

### 2. Steps to the Transaction

On December 29, 1986, the following transactions occurred at a simultaneous closing:

1. A syndicate of banks (the "Banks") for which Wells Fargo and Marine acted as agents (the "Agents") extended a five-year $455,000,000 term loan (the "Term Loan"), a revolving credit of $78,000,000 and a standby letter of credit facility of $34,000,000 to Old Revco;

2. Anac issued its common stock and preferred stock as described earlier;

3. Merger Sub issued the Subordinated Notes as described earlier;

4. Merger Sub merged with and into Old Revco, with Old Revco being the surviving corporation. By operation of this merger (the "Merger"), (a) each share of Merger Sub's outstanding common stock was converted into one share of stock of the surviving corporation, (b) each of the 238,867 Management Transfer Shares then held by Acquisition was converted into one share of common stock of the surviving corporation, (c) each other share of Old Revco common stock held by Anac or any of its subsidiaries and all treasury shares of Old Revco were cancelled and (d) each other share of Old Revco common stock was converted into the

right to receive $38.50 in cash. The cash necessary to effect this transaction was derived from the proceeds of the Term Loan, the Subordinated Notes and the other Anac securities;

5. By operation of the Merger, Old Revco acquired all the assets and liabilities of Merger Sub, including the liabilities on the Subordinated Notes;

6. Approximately $117,000,000 of pre-existing private debt of Old Revco was repaid;

7. The holders of the Pre–LBO 11⅛% Notes consented to the granting of collateral to secure the Loan Agreement obligations without receiving equal and ratable security in consideration of a payment of one percent of the principal amount thereof and an increase in the interest rate from 11⅛% to 12⅛%; and

8. The Pre–LBO 11¾% Debentures received equal and ratable security under the Collateral Trust Agreement.

The proxy material sent to Old Revco's shareholders in connection with the Merger contained Goldman Sachs' opinion that the consideration to be received by Old Revco's shareholders in the Merger was fair to such holders.

At the closing, Peat Marwick, who were accountants for Anac, Old Revco and Revco, delivered a letter addressed to Old Revco and the Agents stating that, subject to the procedures, assumptions, and qualifications set forth in the letter, no matters had come to its attention which caused it to believe that the surviving corporation of the Merger was not solvent (as defined therein) as of December 29, 1986, after giving effect to the transactions occurring on that date. The letter defined "solvency" to mean, essentially, that (i) stockholders' equity was greater than zero, (ii) current assets exceeded current liabilities, and (iii) the surviving corporation was able to pay its liabilities, that were or would be due as of December 29, 1986. The letter, however, expressly disclaimed any opinion on solvency.

The result of these transactions was that Acquisition and the Mirror Subsidiaries be-

came the holders of all of Old Revco's common stock and Old Revco incurred long-term debt in connection with the acquisition of approximately $1.15 billion, leaving it with aggregate long-term debt of approximately $1.2 billion.

On December 30, 1986, the following transactions occurred:

1. Old Revco redeemed the shares of its own stock which were held by each Mirror Subsidiary in exchange for the shares which Old Revco held in one of its six existing subsidiaries. As a result of this redemption Old Revco became a wholly-owned subsidiary of Acquisition, and each of the Mirror Subsidiaries received a subsidiary of Old Revco as its wholly-owned subsidiary;

2. Old Revco merged into Acquisition, with Acquisition being the surviving corporation ("Revco"). Revco was a wholly-owned subsidiary of Anac and held all of the stock of the Mirror Subsidiaries; and

3. Revco changed its name to "Revco D.S., Inc.", the same name as Old Revco.

### 3. Bank Debt

To finance a portion of the Merger, a Term Loan Agreement dated as of December 29, 1986 (the "Term Loan Agreement"), among Revco, Anac, Acquisition, the Banks and the Agents was entered into, pursuant to which the Banks agreed to make the Term Loan in the aggregate amount of $455,000,000 to Old Revco at the closing of the Merger. The Term Loan Agreement set forth a repayment schedule under which the final payment was due on November 16, 1991. Among others, significant provisions in the Term Loan Agreement included:

1. Revco was generally required to use the net proceeds of asset dispositions to prepay the Term Loan;

2. Within ninety days after the end of each fiscal year, Revco was required to make a prepayment of principal in an amount equal to 50% of Anac's

Excess Consolidated Cash Flow, *i.e.*, consolidated net income subject to certain adjustments (a "Cash Flow Payment");

3. Revco was required to transfer or otherwise dispose of certain designated assets which would yield net proceeds of not less than $255,000,000 by November 12, 1988;

4. Capital expenditures in any fiscal year would be limited to (a) $37,500,000 during the 1987 fiscal year and (b) an amount determined pursuant to a designated formula during subsequent fiscal years. In any event, capital expenditures could not exceed $30,000,000 in any subsequent fiscal year. This amount of capital expenditures was significantly less than the levels incurred by Old Revco in recent years;

5. During the term of the Term Loan Agreement, Anac was required to pay all dividends on the Exchangeable Preferred in additional shares of Exchangeable Preferred, and not in cash; and

6. Covenants existed requiring Anac and Revco to maintain certain levels of consolidated tangible capital, consolidated working capital, consolidated current ratio, consolidated cash flow and ratios relating to inventory.

Concurrently, the same parties entered into a Revolving Credit Agreement (the "Revolving Credit Agreement"; the Term Loan Agreement and the Revolving Credit Agreement are sometimes collectively called the "Loan Agreements"). Pursuant to the Revolving Credit Agreement, the Banks agreed to extend to Revco (a) a revolving credit working capital facility in an aggregate principal amount at any one time outstanding not exceeding $78,000,000 ($40,000,000 of which could be used for the issuance of commercial letters of credit), (b) a standby letter of credit facility pursuant to which letters of credit in the aggregate amount not exceeding $32,000,000 at any one time outstanding would be issued in connection with premium payment obligations and shortfalls in coverage under Revco's self-insurance program, and (c) a corporate letter of credit facility pursuant to which the Banks agreed to issue up to a maximum amount of $2,000,000 of general corporate standby letters of credit. The term of the Revolving Credit Agreement was three years. The Revolving Credit Agreement also contained the same limits on capital expenditures, financial covenants, and requirements that dividends on the Exchangeable Preferred be paid in kind, as were set forth in the Term Loan Agreement.

Under the Loan Agreements, Anac and Acquisition each guaranteed the punctual payment when due of all the terms and provisions of the documents relating to the Bank financing. Pursuant to a Credit Support and Security Agreement dated as of December 29, 1986, certain of Old Revco's Subsidiaries (the "Revco Subsidiaries") guaranteed payment and performance of Old Revco's obligations to the Banks.

Pursuant to a series of security agreements, pledge agreements, and assignment agreements, each dated as of December 29, 1986, Old Revco, the Revco Subsidiaries and Acquisition granted a lien and security interest in substantially all of their respective assets to J. Henry Schroder Bank & Trust Company and George R. Sievers (collectively the "Collateral Trustees"), as trustees under a collateral trust agreement dated as of December 29, 1986 (the "Collateral Trust Agreement"), by and among Old Revco, the Revco Subsidiaries, and the Collateral Trustees. The Collateral Trustees were holding the collateral for the benefit of (a) the Banks, (b) Mellon Bank N.A. as Indenture Trustee under the Indenture pursuant to which the Pre–LBO 11¾% Debentures were issued, and (c) Henry Schein, Inc. ("Schein") and Steris Laboratories, Inc. ("Steris"). This mechanism was used in order to accomplish the following objectives:

1. The Pre–LBO 11¾% Debentures were granted equal and ratable security in the collateral with the Banks.

2. Steris, a subsidiary of Schein, agreed to acquire the assets of Carter–Glo-

gau Laboratories, Inc. ("Carter–Glogau"), a subsidiary of Revco which had incurred significant liabilities arising from a drug it had produced which allegedly caused deaths and defects in infants. As part of the asset purchase agreement dated December 18, 1986 (the "Carter–Glogau Agreement"), Old Revco indemnified Schein and Steris from and against product liability actions. The Carter–Glogau Agreement required Revco's indemnity obligations to be Secured by Old Revco's assets, and to be guaranteed by and secured by the assets of Old Revco's parents, subsidiaries and affiliates, to the same extent as was required under the Loan Agreements, in the event the Merger and the Loan Agreements closed. The Collateral Trust Agreement was the vehicle used to secure Old Revco's indemnification obligations.

On the same day, Anac executed a series of documents pursuant to which it granted to the Banks and to Schein and Steris se-curity interests in substantially all of Anac's assets. The security interest in favor of the Banks secured Old Revco's obligations under the Loan Agreements. The security interest in favor of Schein and Steris secured Anac's guaranty of Old Revco's indemnification obligations under the Carter–Glogau Agreement. Wells Fargo, individually and as Agent for the Banks, Schein, and Steris also entered into an Inter–Creditor Agreement dated December 29, 1986, pursuant to which the respective rights and obligations of those parties to the collateral were set forth.

4. Fees, Expenses and Indemnification

During the course of the series of transactions leading to the consummation of the Revco LBO, Old Revco essentially agreed to pay all fees and expenses (including legal fees) incurred by the various entities involved in the transaction, and to indemnify them against most liabilities arising from the transaction. Based on documents provided to the Examiner, it appears that at least the following fees and expenses were paid by Old Revco or Revco on or contemporaneously with the closing:

| | |
|---|---:|
| Salomon—underwriting commissions | $29,832,000 |
| Salomon—investment banking fees | 6,000,000 |
| Salomon—private placement fee | 2,975,000 |
| NY Life—commitment fee | 1,176,471 |
| NYLIAC—commitment fee | 588,235 |
| Morgan Guaranty—commitment fee | 235,294 |
| Wells Fargo—various fees and expenses | 17,272,612 |
| Chicago Title | 222,356 |
| Ellis County Abstract and Title | 5,796 |
| Goldman Sachs | 4,300,000 |
| Golenberg & Co. | 6,049,073 |
| Fried Frank | 75,129 |
| Conyers, Dill & Pearman | 39,230 |
| Jaffe, Snider | 89,344 |
| Kramer Levin | 50,000 |
| Appleby, Spurling & Kempe | 8,991 |
| Benesch Friedlander | 1,975,000 |
| TSG Holdings Inc. | 600,000 |
| Weil Gotshal | 141,087 |
| Cleary Gottlieb | 1,566,704 |
| | $73,202,322 |

While these numbers may not be entirely accurate, based on the documents they ap-pear to be substantially correct. Not included in the above table are certain rela-

tively minor fees and expenses, such as accounting fees, proxy solicitation fees, SEC filing fees, and appraisals, all of which the Examiner estimates aggregate less than $2,000,000. The Examiner also has been advised that Thompson Hine & Flory represented Old Revco in this transaction, although he has not been able to ascertain the amount of fees paid to that firm.

### D. *Operational Changes*

The Prospectus (at pages 10 through 12) discusses a number of factors upon which management based its belief that Revco's operating performance would improve subsequent to the Revco LBO. While most of these factors relate to emphasizing strengths which existed prior to the Revco LBO, elements which represented operational or directional changes were as follows:

1. The Prospectus stated that Anac intended to divest substantially all of Revco's non-retail drugstore businesses, except for Odd Lot, as well as approximately 100 drugstores;

2. Anac's plans to expand Revco included opening or acquiring approximately 100 stores per year during the five-year period immediately after the Revco LBO;

3. Management stated that it believed capital expenditures could be maintained at a lower level than had been the case in the most recent three years because approximately 75% of all Old Revco drugstores were new or remodeled since the beginning of fiscal 1981; and

4. As part of the efforts to increase profitability, Old Revco management had implemented an inventory reduction program which was scheduled to have been substantially completed by the end of fiscal 1987. According to the Prospectus, management anticipated that inventory levels would be reduced by approximately $75,000,-000. The Prospectus also refers to a program to reduce selling, general and administrative expenses by approximately $24,000,000 during 1987.

The Prospectus states (for example on page 13), that management believed that after the Revco LBO Revco would have sufficient cash flow from operations to meet its debt obligations. This belief was based on the estimate of revenues and operating profits to be generated after taking into account the asset divestiture program and the expected continued growth in Revco's drugstore division's sales. According to the Prospectus, however, on a pro forma basis, Anac's consolidated earnings before fixed charges for the fiscal year ended May 31, 1986, would have been inadequate to cover fixed charges resulting from the debt to be incurred in connection with the Revco LBO financing. For example, according to the pro forma Condensed Statements of Operations for that date appearing in the Prospectus, interest expense of $156,000,-000 was projected on an annual basis. Old Revco has not achieved consolidated operating profits of more than $129,000,000 in any fiscal year from 1982 through 1986, except for 1984 when it earned $177,000,-000.

### E. *Post–LBO Events*

There is reason to believe that Revco began experiencing financial difficulties soon after the Revco LBO was consummated. In a January 2, 1987 memorandum to Senior Management, Wilbur Smith, Revco's Treasurer, expressed serious concerns about cash flow, stating:

I am very concerned about cash flow since the sales for the past six weeks have been poor resulting in approximately $30 million less cash flow. It will be very difficult to make up this loss of funds. In fact, we have no excess cash going forward.

Moreover, a program entitled "Operation Clean Sweep" was implemented in 1987. It appears that this program was designed to liquidate inventory which had been introduced into the Old Revco system in 1985 and 1986 to generate high margins, but in fact was not being successfully sold (*e.g.,* television sets, videocassette recorders, microwave ovens, gas grills and knockdown furniture). It is unclear whether Operation

Clean Sweep was a part of the inventory reduction program described in the Prospectus. That program seemed to be more directed towards rationalizing the various sizes and number of units of inventory items carried, rather than effecting a fundamental change in inventory mix.

The implementation of Operation Clean Sweep caused a large amount of inventory to be liquidated at very low prices. While a significant amount of cash was generated by this program, in the summer of 1987 Revco was required, as a result of the influx of this cash, to make a Cash Flow Payment under the Term Loan Agreement in the amount of approximately $39,000,-000. This payment appears to have left Revco with depleted inventory and insufficient cash to replenish its inventory. Accordingly, later in 1987 the Banks extended a $30,000,000 overline facility to provide Revco with working capital to finance operations during the 1987 Christmas season. Apparently, however, Revco was still unable to obtain sufficient inventory in time to avoid an extremely disappointing Christmas season.

To date the Examiner has been unable to ascertain the extent to which Revco management anticipated the problems that were occasioned by the interplay of the Cash Flow Payment requirement and Operation Clean Sweep. A representative of Wells Fargo has stated that Revco did not approach the Banks to seek a waiver or amendment of the Term Loan Agreement at the time Operation Clean Sweep was implemented or the 1987 Cash Flow Payment was made.

F. *Dworkin Unwind*

As part of the Revco LBO, Sidney Dworkin, his son Marc, and William B. Edwards received new employment agreements in connection with their positions as senior executives of Revco. Shortly after the Revco LBO, pressure was exerted to institute a management change. Accordingly, pursuant to a Severance Agreement dated as of September 25, 1987 (the "Severance Agreement") among Anac, Revco, Sidney and Marc Dworkin, the Dworkins resigned from their positions in Anac and Revco. By a separate agreement effective March 24, 1988 (the "Edwards Severance Agreement"), William B. Edwards also resigned his positions. Although these individuals had resigned prior to March 1988, it took several months to negotiate all aspects of their arrangements, and the severance agreements were consummated in March 1988.

Pursuant to the severance arrangements, each individual received certain payments required by his post-Revco LBO employment agreement and deferred compensation plan. In addition, the Dworkins received certain additional payments not required by those agreements, including payments for rent, legal and accounting fee reimbursements, and payments with respect to medical and life insurance. There was also a series of transactions pursuant to which (1) the shares of two Revco subsidiaries, Sid's Get It For Less, Inc. ("GIFL") and General Computer Corporation ("GCC"), were transferred to Sidney Dworkin, (2) the Anac common stock held by Sidney Dworkin was repurchased by Anac and (3) Sidney Dworkin received title to a condominium in New York City and a lifetime Revco 15% discount card. Revco "upstreamed" to Anac approximately $5,000,-000 to facilitate these transactions.

Below is a table setting forth information contained in a report prepared by Benesch Friedlander summarizing the amounts involved in the Dworkin Unwind. The Examiner has not yet had an opportunity to verify this information.

| | Amount |
|---|---|
| 1. Payments and Transfer to Dworkins and Edwards | |
| Payment for 615,000 Shares of Anac Common Stock owned by SEMCO Limited Partnership | 4,271,790.00 |
| Payment for 540,000 Shares of Anac Common Stock owned by SIWI Associates | 3,750,840.00 |

| | Amount |
|---|---|
| Severance Payments | |
|   Sidney Dworkin | $1,250,000.00 |
|   Marc Dworkin | 450,000.00 |
|   William E. Edwards | 1,300,000.00 |
| Deferred Compensation | |
|   Sidney Dworkin | 2,785,129.00 |
|   Marc Dworkin | 115,560.00 |
|   William E. Edwards | 338,280.00 |
| Bonus—Marc Dworkin | 31,817.00 |
| Vacation Pay—Sidney Dworkin | 48,076.92 |
| Additional Payments (1) | 135,000.00 |
| Medical Equivalent Payment (1) | |
|   Sidney Dworkin | |
|     (covering 9/25/87 to 3/31/88) | 956.88 |
|   Marc Dworkin | |
|     (covering 9/25/87 to 3/31/88) | 956.88 |
| Life Insurance Equivalent Payment (1) Sidney Dworkin | |
|   (covering 11/1/87 to 3/31/88) | 3,236.00 |
|   (covering 4/1/88 to 12/31/88) | 5,824.80 |
| Marc Dworkin | |
|   (covering 11/1/87 to 3/31/88) | 1,626.00 |
|   (covering 4/1/88 to 12/31/88) | 2,926.80 |
| Legal Fees (Dworkins, Revco required to reimburse or pay for) (1) | 121,500.00 |
| Accounting Fees (Dworkins, Revco required to reimburse or pay for) (1) | 49,099.00 |
| Reimbursement for Office Rental (period 3/1/88 to 3/31/88) (1) | 495.83 |

## 2. Payments and Transfer from Dworkins

| | Amount |
|---|---|
| Reimbursement of Compensation Overpayment | |
|   Marc Dworkin to Revco | $ 1,874.19 |
| Medical Equivalent Payment | |
|   Sidney Dworkin to Revco (covering 9/25/87–3/31/88) | 1,226.88 |
|   Marc Dworkin to Revco (covering 9/25/87–3/31/88) | 1,226.88 |
| Life Insurance Equivalent Payment | |
|   Sidney Dworkin to Revco (covering 11/1/87–3/31/88) | 3,236.08 |
|   Marc Dworkin to Revco (covering 11/1/87–3/31/88) | 1,626.00 |
| Payment for Automobiles | |
|   Sidney Dworkin | 13,519.92 |
|   Marc Dworkin | 3,589.60 |
| Payment for General Computer Corporation stock | 3,346,775.34 |
| Payment for Condominium | 285,085.55 |
| Proration/Adjustment of Condominium Real Estate Taxes | 1,305.22 |
| Payment for Condominium Personal Property | 54,683.16 |
| Payment for Sid's Get It For Less, Inc. Stock | 3,938,243.00 |
| Payment for Office Furniture | |
|   Sidney Dworkin | 3,206.35 |
|   Marc Dworkin | 10,249.98 |

(1) Not required by pre-existing arrangements.

---

On July 28, 1988 Anac Revco petitioned the Court for protection under Chapter 11 of the Bankruptcy Code.

## IV. STATUTES OF LIMITATIONS

Before the Examiner may suggest whether causes of action should be commenced, it must be determined whether and when the causes of action are barred by applicable statutes of limitations. The Examiner's analysis concludes that the Michigan corporate statutory causes of action expire on July 25, 1990.[1] The statutes of limitations on other causes of action expire

---

1. Bunin Enterprises, Inc., apparently a Revco affiliate, filed its bankruptcy petition on July 26, 1988, two days before Revco and Anac. For

in late 1990. This section discusses the relevant issues concerning the various statutes of limitations.

### A. Section 546 of the Bankruptcy Code

A significant number of the potential causes of action are based on state fraudulent conveyance laws. These actions may be brought by a bankruptcy trustee or debtor in possession pursuant to section 544(b) of the Bankruptcy Code. While section 544(b) does not address the application of state statutes of limitations to these causes of action, section 546 of the Bankruptcy Code provides:

> (a) An action or proceeding under section 544, 545, 547, 548 or 553 of this title may not be commenced after the earlier of—
>
> (1) two years after the appointment of a trustee under section 702, 1104, 1163, 1302, or 1202 of this title; or
>
> (2) the time the case is closed or dismissed.

Thus, a trustee must commence a fraudulent conveyance action brought pursuant to section 544(b) within this time frame.

Although section 546 requires that the action be brought prior to the earlier of the two dates, it is well settled that the two year limitation set forth in section 546(a)(1) is not operative when a debtor in possession is in place rather than a trustee.[2] *See One Marketing Co. v. Addington & Assoc. (In re One Marketing Co.),* 17 Bankr. 738 (Bankr.S.D.Tex.1982). *See also Edelman v. Gleason (In re Silver Mill Frozen Foods)* 23 Bankr. 179 (Bankr.W.D.Mich. 1982) (under section 546(a)(1) the two year statute of limitations begins to run from the appointment of a trustee, and not from the filing of the chapter 11 petition); *Alithochrome Corp. v. East Coast Finishing Sales Corp. (In re Alithochrome Corp.),* 53 Bankr. 906 (Bankr.S.D.N.Y.1985) (two year statute of limitations did not bar preference action by debtor in possession); *Korvettes, Inc. v. Sanyo Elec. (In re Korvettes, Inc.),* 67 Bankr. 730 (S.D.N.Y.1986), *rev'g* 42 Bankr. 217 (Bankr.S.D.N.Y.1984).

Having determined that the two year limitation of section 546(a)(1) does not apply to a debtor in possession, the critical issue is whether section 546(a)(2) extends the statute of limitations beyond the time period prescribed by state law. The cases support the proposition that section 546(a)(2) extends the statute of limitations and enables a debtor in possession to bring a fraudulent conveyance action until the case is closed or dismissed. In *Korvettes,* the basis for the district court's reversal of the bankruptcy court was the bankruptcy court's refusal to apply section 546(a)(2) to the debtor in possession. The district court held:

> [I]t is undisputed that Korvettes' bankruptcy case was neither closed nor dismissed at the time the adversarial proceeding was commenced. Accordingly, it was not barred by the statute of limitations.

*Id.* at 734.

The court similarly applied section 546(a)(2) to extend the state statute of limitations in *Mahoney, Trocki & Associates v. Kunzman (In re Mahoney, Trocki & Associates),* 111 Bankr. 914 (Bankr.S.D.Cal. 1990). There, the last of a series of alleged fraudulent transfers was made on January 31, 1983. On May 23, 1984, the plaintiff filed for bankruptcy. On May 23, 1986, the debtor in possession commenced an action to recover the alleged fraudulent conveyances under section 544(b) of the Bankruptcy Code, applying the California Uniform Fraudulent Conveyance Act which had a three year statute of limitations. The

---

purposes of this analysis the Examiner will use the earlier filing date.

**2.** Although a debtor in possession is ordinarily referred to as a trustee in accordance with section 1107(a) which provides that, "a debtor in possession shall have all the rights ... and shall perform all the functions and duties ... of a trustee serving in a case under this chapter,"

case law has distinguished section 546(a)(1) as applying exclusively to an actual trustee. This distinction is justified as the statute refers to the appointment of a trustee under section 1104. A debtor in possession is not appointed and does not obtain its trustee status pursuant to section 1104.

bankruptcy court held the action was timely, stating "[i]f the state fraudulent conveyance action could have been brought immediately prior to the bankruptcy petition then 11 U.S.C. § 546(a) provides a specific time within which that action can be brought pursuant to 11 U.S.C. § 544," *id.* at 918 (citation omitted), and went on to hold that the action could be brought until the case was closed or dismissed.

Despite the apparently clear holding of the *Korvettes* and *Mahoney* cases, a careful reading of the statute suggests that section 546(a), entitled "Limitations on avoiding powers," acts only as a limitation. Rather than extending a state statute of limitations, the provision on its face arguably places an additional time bar on the commencement of actions. Although this argument appears logical, it has recently been rejected by the district court in *Rosania v. Haligas (In re Dry Wall Supply)*, 111 Bankr. 933 (D.Colo.1990).

Accordingly, the weight of authority supports the proposition that as long as the statute of limitations has not run as of the date of the filing of the petition, section 546(a) acts to extend the time to bring the cause of action. Nevertheless, neither the Supreme Court nor any court of appeals has spoken definitively on this issue. Therefore, a colorable case could be made that section 546 should not extend the state statute of limitations.

In the unlikely event that section 546(a) does not extend the statute of limitations, then the state statute of limitations would govern actions brought by a debtor in possession pursuant to section 544. It is in the best interests of the creditors and the estates to have the fraudulent conveyance litigation resolved efficiently. If the debtor in possession, in reliance upon the above case law discussing section 546(a), waits to commence the fraudulent conveyance litigation until after the state statute of limitations passes, it will most certainly be faced with additional procedural motion practice. Accordingly, in view of the sub-

stantial value of potential fraudulent conveyance actions, coupled with the magnitude of the amount of recovery which could be lost if an action is not timely commenced, it would be unwise to rely on section 546(a) as extending the statute of limitations beyond the state law limitation. Accordingly, any litigation based on fraudulent conveyance should be commenced no later than December 28, 1990.

B. *Section 108 of the Bankruptcy Code*

Section 108 of the Bankruptcy Code introduces further statute of limitations considerations. Section 108 provides, in pertinent part:

> (a) If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—
>
> (1) the end of such period ... or
>
> (2) two years after the order for relief.

11 U.S.C. § 108. Under section 108, a trustee or debtor in possession may commence an action available to the debtor under nonbankruptcy law within the operative nonbankruptcy statute of limitations. If, however, the limitations period has not expired prior to the commencement of the bankruptcy case, but expires less than two years subsequent to the commencement, the limitations period is extended until two years after the commencement of the bankruptcy case. *TCI Ltd. v. Sears Bank & Trust Co. (In re TCI Ltd.)*, 21 Bankr. 876 (Bankr.N.D.Ill.1982).

Unlike the two year limit set forth in section 546(a)(1), which does not apply to a debtor in possession, section 108 has been construed as applying to a debtor in possession in a chapter 11 case. *See, e.g., Motor Carrier Audit & Collection Co. v. Lighting Prods.*, 113 Bankr. 424 (N.D.Ill.1989).[3]

---

**3.** In *Northern Specialty Sales v. INTV Corp. (In re Northern Specialty Sales)*, 57 Bankr. 557, 559

n. 1 (Bankr.D.Or.1986), the Bankruptcy Court stated:

The language of section 108(a) appears to limit the scope of actions which it encompasses. In particular, the statute provides that the extension of time refers only to causes of action which the *debtor* may bring. It affords the *trustee* at least two years to bring the action (post-petition). The clear implication of this language is that section 108(a) applies only to actions that could have been brought by the pre-petition debtor. These include tort actions, breach of contract actions, or any other action that a debtor could bring absent a bankruptcy filing.

State law fraudulent conveyance actions cannot be brought by a debtor in the absence of bankruptcy proceedings. Outside the context of a bankruptcy case, such actions may be brought by creditors only. It is only the avoidance powers afforded to the debtor in possession and trustee by section 544 that enable a debtor or trustee to bring fraudulent conveyance actions. Courts have, therefore, construed section 108 to be inapplicable to actions brought under section 544, leaving such actions subject only to the limitations set forth in section 546. *See Hunter v. Hansen (In re Hansen)*, Nos. 87–0094, 83–02074 (Bankr. N.D.Ohio Apr. 20, 1990) (1990 Bankr. LEXIS 1108); *Mahoney, Trocki & Assoc.*, 111 Bankr. 914; *McCoy v. Grinnell (In re Radcliffe's Warehouse Sales)*, 31 Bankr. 827 (Bankr.W.D.Wash.1983). *But see Murdock v. Plymouth Enter. (In re Curtina Int'l)*, 23 Bankr. 969 (Bankr.S.D.N.Y.1982) (trustee was afforded a tolling privilege under section 108 to commence an action alleging that the transfer violated state bulk sales law). Although section 108(a) does not appear to apply to a fraudulent conveyance action brought under section 544(b), the provision does apply to malpractice, negligence, and other actions that could have been brought pre-petition. Section 108(a) requires that these actions be brought by the later of two years after the order for

relief or the expiration of the applicable state law limitation period.

As this Preliminary Report indicates, the statute of limitations on the Michigan actions would have already run but for the tolling provision in section 108(a). Therefore it will expire on July 25, 1990. The statutes of limitations on several other potentially important actions will expire in late 1990, possibly as early as November. The Bankruptcy Code does not further extend these actions.

### C. *Statutes of Limitations on State Causes of Action*

A federal court sitting in Ohio will apply Ohio law to determine the appropriate statute of limitations. *Mahalsky v. Salem Tool Co.*, 461 F.2d 581, 584 (6th Cir.1972). As statutes of limitations are procedural in nature, the statute of limitations of the forum state generally applies. *Kerper v. Wood*, 48 Ohio St. 613, 622, 29 N.E. 501, 502 (1891); *Howard v. Allen*, 30 Ohio St.2d 130, 283 N.E.2d 167, 169 (1972); *Alexander & Assocs. v. Wilde*, No. 49046 slip op. at 2 (Ohio Ct.App. Aug. 21, 1987) (1987 WL 15918). This is true regardless of where the cause of action arose. *Lee v. Wright Tool & Forge Co.*, 48 Ohio App.2d 148, 356 N.E.2d 303, 306 (1975).

Based on the fact that these matters are pending in Ohio, the Examiner believes that a court would apply Ohio statutes of limitations to any state law claims including claims of fraudulent conveyance, negligence, professional malpractice, breach of fiduciary duty and breach of contract.

#### 1. Fraudulent Conveyance Claims

Section 544(b) of the bankruptcy code grants the trustee or debtor in possession the power to "avoid any transfer of an interest of the debtor in property ... that is voidable under the state law." 11 U.S.C. § 544(b). Accordingly, the debtor in pos-

---

One might argue that § 108(a) is not necessary with respect to pre-petition claims in Chapter 11 where the debtor remains in possession and therefore knows, or should know, of the existence of pre-petition claims. Even though the debtor in possession should know of pre-petition claims, § 108(a) is designed to

protect creditors, not debtors. This is evident where the debtor in possession fails to pursue a claim (perhaps because the debtor in possession knows it will only benefit creditors). In that case, § 108(a) gives creditors time to investigate and pursue collection of claims for the benefit of the estate.

session may commence a fraudulent conveyance action under the applicable state's fraudulent conveyance statutes, assuming the time within which to commence the action did not expire before the filing of the bankruptcy petition.

The Ohio Uniform Fraudulent Conveyance Act, Ohio Rev.Code Ann. §§ 1336.01–1336.12 (Anderson Supp.1989), has a four year statute of limitations. *Hunter v. Hansen (In re Hansen)*. The four years begins to run from the discovery of the fraud. *See Corzin v. Haugen (In re Flexible Artcraft Graphics Unlimited)*, 74 Bankr. 917 (Bankr.N.D.Ohio 1987); *Peterson v. Teodosio*, 34 Ohio St.2d 161, 297 N.E.2d 113 (1973). Since the Merger closed on December 29, 1986, the Ohio statute of limitations would not expire before December 28, 1990.[4] To the extent any actionable transfers occurred prior to the Merger, those claims would expire four years from the date of the transfer.

### 2. Claims Other Than Fraudulent Conveyance

Based on the Examiner's analysis to date, the Examiner believes that the debtors should also consider commencing various actions in negligence, professional malpractice, breach of fiduciary duty and breach of contract. Again it appears that the Ohio statute of limitations should apply to all common law claims asserted in these chapter 11 proceedings.

The Ohio statute of limitations for negligence is four years, Ohio Rev.Code Ann. § 2305.09(D) (Anderson 1981), while the statute of limitations for professional malpractice actions is one year. *See* Ohio Rev. Code Ann. § 2305.11(A) (Anderson Supp. 1989). A professional malpractice action against accountants, however, is not brought under § 2305.11(A), so the four

year statute applies. *See Richard v. Staehle*, 70 Ohio App.2d 93, 434 N.E.2d 1379, 1383 (1980).

Breach of fiduciary duty under Ohio law has a four year statute of limitations. *See* Ohio Rev.Code Ann. § 2305.09 (Anderson 1981); *Thropp v. Bache Halsey Stuart Shields, Inc.*, 650 F.2d 817, 822 (6th Cir. 1981). Breach of contract claims must be commenced within fifteen years if the contract is in writing or within six years if it is not in writing. *See* Ohio Rev.Code Ann. §§ 2305.06, 2305.07 (Anderson 1981).[5]

Based on the Examiner's analysis to date, the Examiner believes that the various organizations or individuals who might be the targets of state law claims all provided services to the estates up to and including the date of the Merger. Accordingly, causes of action against these entities would have accrued as of December 29, 1986. It is possible that further factual analysis may reveal claims that arose somewhat before that date. Accordingly, the Examiner recommends that, in an exercise of caution, any such claims be brought by November, 1990.

## V. CHOICE OF LAW ISSUES

In addition to the statute of limitations analysis, because Ohio is the forum state, an analysis of Ohio choice of law principles is required to determine what substantive law applies in this case. For the reasons discussed below, it appears that, except as discussed below with respect to the Michigan corporate claims, nonbankruptcy law issues will be governed by the substantive law of the State of Ohio, based on the following contacts:

    1. The parties conducted substantial negotiations of the Revco LBO in Ohio;

---

**4.** If it was successfully argued that the fraud was not discovered until July 28, 1988, when Revco filed its petition in bankruptcy, the statute of limitations would not run until July 28, 1992.

**5.** Research has failed to disclose any Ohio cases concerning which state's statute of limitations will control a breach of contract claim brought in Ohio when that same contract has a choice of law provision. However, other courts have con-

clusively held that contractual choice of law provisions merely govern the choice of substantive law to be applied and do not govern the choice of the statute of limitations. *Federal Deposit Ins. Corp. v. Peterson*, 770 F.2d 141, 142–43 (10th Cir.1985). Therefore, the limitation period of the forum state will be applied. *Des Brisay v. Goldfield Corp.*, 637 F.2d 680, 682 (9th Cir.1981).

2. Tangible and intangible assets of Old Revco and Revco are located, *inter alia*, in Ohio, including the Revco headquarters;

3. Representations concerning the Revco LBO and various financial projections were made to the creditors of Old Revco and Revco in, among other places, Ohio;

4. Some Old Revco and Revco creditors acted in reliance on those representations in, among other places, Ohio;

5. Various documents and agreements involved in the Revco LBO were prepared and executed in whole or in part in Ohio, some of which also provide that the governing law concerning, *inter alia*, interpretation of the agreements is that of Ohio; and

6. The principal place of business of Old Revco was, and Revco is, in Ohio.

### A. *Analysis*

Generally, a court will apply its own forum's choice of law principles to determine which jurisdiction's substantive law controls in a multi-state controversy.[6]  E. Scoles & P. Hay, *Conflict of Laws* § 3.1, at 50 (1984); *Bailey v. Chattem, Inc.*, 684 F.2d 386, 392 (6th Cir.1982). This is appropriate because a state may not apply its law when it has no significant contact with the transaction or occurrence at issue. *Home Ins. Co. v. Dick*, 281 U.S. 397 (1930). Likewise, if the case is commenced in federal court sitting in diversity, that court must apply the choice of law rules of the state in which it sits. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941); *Dress-*

*er Indus. v. Sandvick*, 732 F.2d 783, 785 (10th Cir.1984).

The characterization of a claim as a tort, breach of contract, or an equitable one will often affect the outcome of the application of the choice of law rules.[7]  E. Scoles & P. Hay, *Conflict of Laws* § 3.3, at 52–53 (1984); *cf. Leach v. Newport Yellow Cab, Inc.*, 628 F.Supp. 293, 297 n. 2 (S.D.Ohio 1985) *aff'd*, 815 F.2d 704 (6th Cir.1987); *Barile v. University of Va.*, 30 Ohio App.3d 190, 507 N.E.2d 448, 450 (1986). Set forth below is a discussion of the various choice of law rules under Ohio law, as the forum state, as well as those used by the bankruptcy courts and the Sixth Circuit in general.

### 1. Tort, Including Fraudulent Conveyance Claims

In *Morgan v. Biro Manufacturing Co.*, 15 Ohio St.3d 339, 474 N.E.2d 286, 288 (1984), the Supreme Court of Ohio held that it would no longer automatically apply the *lex loci delicti* (the law of the place of injury) rule. While the court found the traditional rule of *lex loci delicti* still created a presumption, it recognized that the presumption could be rebutted by using the analysis set forth in the Restatement (Second) of Conflict of Laws (1969). That analysis required a review of such factors as where the conduct occurred, the location of the place of business and the place of injury. *Morgan*, 15 Ohio St.3d 339, 474 N.E.2d at 288–89. *See also Bridges v. National Eng'g. & Contracting Co.*, No. C–870730, slip op. at 9–11 (Ohio Ct.App. Sept. 21, 1988) (1988 WL 96988); *Auto-*

---

**6.** Application of one state's law as opposed to another's presupposes that there is a genuine conflict between the respective states' substantive law regarding the claims asserted.  E. Scoles & P. Hay, *Conflict of Laws* § 2.6, at 17–18 (1984).  With respect to the potential fraudulent conveyance claims, four of the states with contacts to the parties or transactions have adopted the Uniform Fraudulent Conveyance Act.  New York, Delaware and Ohio, however, have not adopted the Uniform Act as approved by the National Conference of Commissioners on Uniform State Laws.  Each of those jurisdictions has revised certain sections upon adoption.  Therefore, all four jurisdictions have adopted different versions of the Uniform Act.  For the purposes of this choice of law analysis, this

Preliminary Report assumes the differences are substantial and do not present a "false conflict."

**7.** It has been held that fraudulent conveyance claims are torts for purposes of choice of law issues.  *RCA Corp. v. Tucker*, 696 F.Supp. 845, 847, 853–54 (E.D.N.Y.1988).  However, in *Kaiser Steel Corp. v. Jacobs (In re Kaiser Steel Corp.)*, 87 Bankr. 154, 159 (Bankr.D.Colo.1988), the bankruptcy court concluded that a claim to set aside a conveyance as fraudulent was a claim for equitable relief.  Research has not revealed any Ohio case addressing the proper characterization of such a claim for purposes of a choice of law determination.

*Owners Ins. Co. v. McMahon,* 48 Ohio App.3d 38, 548 N.E.2d 275, 277 (1988).[8]

It should be noted that the Ohio cases previously cited, although speaking in terms of torts in general, were decided in the context of a personal injury or wrongful death action. Nevertheless, a strong argument can be made that even under the traditional "place of injury" analysis, Ohio law will apply. The headquarters of Revco and Old Revco are, and at all times pertinent hereto were, in Ohio. Negotiations occurred in Ohio, agreements were entered into in Ohio and many other events leading up to the Revco LBO occurred in Ohio. Moreover, arguably Ohio, as the state in which the bankruptcy is pending, would have a paramount interest in applying its own laws.

Research has failed to disclose any Ohio state court case addressing choice of law issues specifically with regard to claims of fraudulent conveyance or fraud in general. The Sixth Circuit, however, has considered the choice of law rules under Ohio law for an action based on a claim of fraud and,

without citing any authority, determined that section 148 of the Restatement (Second) of Conflict of Laws governs choice of law for claims of fraud. *Macurdy v. Sikov & Love, P.A.,* 894 F.2d 818 (6th Cir.1990).[9]

Here, since, presumably, creditors in numerous jurisdictions relied on representations made in numerous jurisdictions, and assuming Ohio would follow section 148 of the Restatement (Second) of Conflict of Laws governing fraud claims as the *Macurdy* court presumed, section 148(2) would govern. According to comment j to section 148, if any two factors, apart from the defendant's domicile, state of incorporation or place of business, are located wholly in a single state, that state's law will be applicable to most issues.

The participants negotiated significant aspects of the Revco LBO in Ohio. Representations concerning, *inter alia,* financial projections were made in Ohio. Money was lent and obligations were incurred in Ohio. Likewise, the corporate headquarters of Revco and Old Revco are and were located

**8.** Section 145 of the Restatement (Second) of Conflict of Laws provides:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in appying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

**9.** Restatement (Second) of Conflict of Laws § 148 concerning choice of law for claims for tortious fraud and/or misrepresentation provides:

(1) When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state

determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

(2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicile, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

in Ohio, and various documents were prepared and executed in whole or in part in Ohio which provide that Ohio law governs, *inter alia,* any issues of interpretation.[10]

### 2. Contract Claims

Ohio has adopted the Restatement (Second) of Conflict of Laws' position concerning choice of law issues arising in a case involving a contract. *Gries Sports Enters. v. Modell,* 15 Ohio St.3d 284, 473 N.E.2d 807, 810 (1984), *cert. denied,* 473 U.S. 906 (1985); *Wehrle v. M–J Painting Co.,* No. 87 C.A. 54 (Ohio Ct.App. May 16, 1988) (1988 WL 49393). Where the parties have not designated a choice of applicable law in their contract, section 188 of the Restatement (Second) of Conflict of Laws provides that the choice of law determination will be based on the significant contacts associated with the contract.[11]

Where a written contract contains an effective choice of law provision, that provision will govern the substantive contractual rights and duties. *Jarvis v. Ashland Oil, Inc.,* 17 Ohio St.3d 189, 478 N.E.2d 786, 788 (1985); *Schulke Radio Prods. v. Midwestern Broadcasting Co.,* 6 Ohio St.3d 436, 453 N.E.2d 683, 686 (1983). Ohio might not follow this rule if:

> (1) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

> (2) application of the law of the chosen state would be contrary to the fundamental policy of a state having a greater material interest in the issue than the chosen state and such state would be the state of the applicable law in the absence of a choice by the parties.

*Jarvis,* 17 Ohio St.3d 189, 478 N.E.2d at 768. *See also Tele–Save Merchandising Co. v. Consumers Distrib. Co., Ltd.,* 814 F.2d 1120, 1122–23 (6th Cir.1987); *AMF, Inc. v. Computer Automation, Inc.,* 573 F.Supp. 924, 933–34 (S.D.Ohio 1983). This view is also in accord with the Restatement (Second) of Conflict of Laws § 187(2).

### 3. Equitable Relief

Research has failed to disclose any case addressing the Ohio choice of law rules for claims that are characterized as demands for equitable relief. Nevertheless, the Examiner believes that Ohio law will apply to such claims.

### 4. Business Corporation Claims

Research has not revealed any Ohio case which addresses the issue of which state's law applies to claims that the officers and directors of a foreign corporation improperly paid dividends. However, Ohio seems to follow the view of the Restatement (Second) of Conflict of Laws for most choice of law issues. Consequently, it appears likely that Ohio would adopt sections 304 or 309

---

**10.** Several factors enumerated in section 6 of the Restatement (Second) of Conflict of Laws, likewise, support the application of Ohio law. Section 6 addresses the concerns of the various governmental interests associated with multistate litigation. While it is not unlikely that at least some affected creditors are located in each of the interested states, (*i.e.,* Ohio, Michigan, New York and Delaware) only Ohio and Michigan seem to have other contacts that address section 6 issues. Because the forum and Revco headquarters are both located in Ohio, it can be said that the ease and application of the law to be applied as well as the protection of justified expectations can best be supported by application of Ohio law.

**11.** Restatement (Second) of Conflict of Laws § 188 provides, in pertinent part:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with

respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties (*see* § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

> (a) the place of contracting,
> (b) the place of negotiation of the contract,
> (c) the place of performance,
> (d) the location of the subject matter of the contract, and
> (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

> \* \* \* \* \* \*

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

of the Restatement in response to this question.[12]

Thus, it appears that Michigan law should control any corporate law issues, *e.g.*, the propriety of dividends, unless it can be demonstrated that some other jurisdiction has a much more significant relationship to the issue. It does not seem likely that this could be demonstrated in these cases.

## B. *Federal Bankruptcy Law*

The Sixth Circuit has not addressed the question of whether a bankruptcy court may apply its own choice of law provisions. Nevertheless, it appears that even if it did, it would still rely on a significant contacts test, similar to the Ohio choice of law analysis.[13] Thus, it appears that the Court would apply Ohio law to substantive issues other than those arising under the Michigan corporate law.

## VI. CLAIMS UNDER MICHIGAN ACT

The Examiner has reviewed the Michigan Act as it existed in 1986 and concludes that claims could be stated under the Michigan Act against directors and shareholders of Old Revco.[14] Nevertheless, because of the

difficulty of meeting the burden of proof, the uncertainty of achieving a substantial recovery, the fact that little if any incremental benefit is offered over a fraudulent conveyance action, and an adverse effect on plan negotiations would likely result if litigation were commenced, the Examiner concludes that the Michigan actions should not be pursued.

### A. *Improper Dividend or Distribution*

Section 351 of the Michigan Act provided:

(1) By action of its board, a corporation may declare and pay dividends or make other distributions in cash, its bonds or its property ... on its outstanding shares, except when currently the corporation is insolvent or would thereby be made insolvent....

(2) Dividends may be declared or paid and other distributions may be made out of surplus only.

For these purposes: the term "insolvent" means being unable to pay debts as they become due in the usual course of a debtor's business (Michigan Act section 107(3)); "surplus" means the excess of net assets

---

**12.** Section 304 of the Restatement (Second) of Conflict of Laws provides:

The local law of the state of incorporation will be applied to determine the right of a shareholder to participate in the administration of the affairs of the corporation, in the division of profits and in the distribution of assets on dissolution and his rights on the issuance of new shares except in the unusual case where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the shareholder and the corporation; in which event the local law of the other state will be applied.

Similarly, section 309 of the Restatement (Second) Conflict of Laws, concerning directors' or officers' liability, provides:

The local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and shareholders, except where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the parties and the transaction, in which event the local law of the other state will be applied.

**13.** For a discussion of this issue, see, e.g., *Kaiser Steel Corp. v. Jacobs (In re Kaiser Steel Corp.),* 87 Bankr. 154, 157 (Bankr.D.Colo.1988).

**14.** The Michigan Business Corporation Act, including the provisions relevant to this case, were *substantially amended in 1989.* Among other things, section 122(3) of the new statute appears to preclude the application of the Michigan fraudulent conveyance act to distributions to shareholders covered by the Act. However, section 127(2) of the Michigan Act states "[t]his act does not affect a cause of action, liability, penalty or action or special proceeding, which on the effective date of this act is accrued, existing, incurred or pending, but the same may be asserted, enforced, prosecuted or defended as if this act had not been enacted." Moreover, any amendment to a Michigan statute is presumed to apply prospectively, in the absence of specific language to the contrary especially where it takes away or impairs vested rights acquired under existing laws. *See Joe Dwyer, Inc. v. Jaguar Cars, Inc.,* 167 Mich.App. 672, 423 N.W.2d 311 (1988); *Karl v. Bryant Air Conditioning Co.,* 416 Mich. 558, 331 N.W.2d 456 (1982). Accordingly, the Michigan Act, as effective in 1986, is relevant to this case.

of a corporation over its stated capital (section 109(4)); and "net assets" means the amount by which the total assets of a corporation exceeds its total liabilities as determined in accordance with generally accepted accounting principles (section 108(1)).

Accordingly, section 351 would have been violated if (1) the consideration Old Revco shareholders received in the Merger were to be considered a "distribution" to Old Revco shareholders and (2) either (a) Old Revco was, or was rendered, unable to pay its debts as they became due, or (b) the distribution was made other than out of surplus.

While it is not entirely clear that Old Revco was unable to pay its debts as they became due as of the closing of the Merger, the Examiner believes that further analyses may well lead to the conclusion that this was the case. If so, Old Revco would have been rendered "insolvent" within the meaning of the statute. Moreover, according to Old Revco's August 23, 1986 balance sheet, its "surplus" was approximately $350 million, far less than the amount paid to its shareholders in the Merger. Thus, if the Merger involved a "distribution" within the meaning of the statute, it appears to have been paid from funds other than surplus. It is, consequently, important to analyze whether the transaction constituted a "distribution" within the purview of the statute.

Conceptually, there appears to be good reason for characterizing the receipt by Old Revco shareholders of cash in the Merger as a distribution. Each shareholder received cash solely by virtue of his being a shareholder. Even if the cash derived from the proceeds of the Anac equity securities and the Subordinated Notes was not treated as cash of Old Revco, and for that reason that part of the transaction is not viewed as a "distribution," there can be no question that the $455 million proceeds of the Term Loan represented cash of Old Revco. Accordingly, even under the most narrow reading of what constitutes a "distribution," the potential for a substantial recovery exists.

The Examiner has been provided with the opinions of two reputable Michigan law firms, neither of which definitively draws conclusions on the applicability or effect of section 351. Independent research confirms that Michigan courts have not discussed the meaning of "distribution" in the context of a leveraged buyout.

However, one court has construed a similar Illinois statute as applicable in a fact situation similar to the Revco LBO. In *Wieboldt Stores v. Schottenstein,* 94 Bankr. 488 (N.D.Ill.1988), a holding company was created which obtained financing from a lender to enable the holding company to purchase through a tender offer 99% of a target Illinois corporation's stock. A claim was asserted under a section of the Illinois Business Corporation Act which prohibited the board of directors from authorizing a distribution to shareholders that would have the effect of rendering the corporation insolvent.

As in the instant case, the Illinois statute did not define the term "distribution." The court referred to section 1.40(6) of the Revised Model Business Corporation Act, from which both the Illinois statute and the Michigan Act are derived, which defines "distribution" broadly to encompass:

> [A] direct or indirect transfer of money or other property (except its own shares) or incurrance of indebtedness by a corporation to or for the benefit of its shareholders in respect of any of its shares. A distribution may be in form of a declaration or payment of a dividend; a purchase, redemption, or other acquisition of shares; a distribution of indebtedness; or otherwise.

Model Business Corp.Act Ann. § 1.40(6) (Prentice Hall 3d ed. Supp.1990).

The court observed that the official comment to this section of the Revised Model Business Corporation Act indicates that the definition is "intended to include any ... transaction in which the substance is clearly the same as a typical dividend or share purchase, no matter how structured or labeled." 94 Bankr. at 511.

Consequently, the *Wieboldt* court held that a cause of action against the target's di-

rectors had been stated for a breach of fiduciary duty under the Illinois statute arising from their approval of the improper distribution, and denied the motion to dismiss the complaint. This result was reached notwithstanding the fact that the funds paid to shareholders came from the purchaser of the target, and not from the funds of the corporation in which the shareholders directly held an interest. *See also United States v. Gleneagles Inv. Co.*, 565 F.Supp. 556 (M.D.Pa.1983) (payment of purchase price to seller and shareholders in a leveraged buyout was determined to be an illegal distribution under Pennsylvania corporations law), *aff'd sub nom. United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.1988), *cert. denied*, 483 U.S. 1005 (1987).

Based on the foregoing, and although there is no controlling Michigan authority in this context, a colorable claim could be made under the Michigan Act for violations of section 351.

### B. *Improper Share Repurchase*

Additionally, under section 365 of the Michigan Act, subject to certain exceptions which are not relevant here, a corporation (a) may only purchase its own shares out of surplus, and (b) may not purchase or redeem its own shares if, among other things, it is insolvent or would be rendered insolvent thereby. For purposes of section 365, the analysis of surplus and insolvency is the same as the case under section 351. The Michigan Court of Appeals has held that generally a payment by a corporation to a selling shareholder must be limited to the corporation's surplus. *See Davis v. Brydges*, 122 Mich.App. 768, 333 N.W.2d 127 (1983); *Van Kampen v. Detroit Bank & Trust Co.*, 40 Mich.App. 589, 199 N.W.2d 470 (1972).

The key question is whether the Merger involved a purchase or redemption by Old Revco of its own stock. The statute does not define "purchase" or "redeem" and no cases have been found which shed significant light on this question. The general purpose of statutes restricting distributions to (*i.e.*, section 351) and repurchases from (*i.e.*, section 365) shareholders, however, is

the same. They are both intended to protect creditors and other shareholders of a corporation from the depletion of assets and impairment of capital. 6A W. Fletcher, *Cyclopedia of the Law of Corporations* §§ 2847–2848 (rev. perm. ed. 1989). *See Myers v. C.W. Toles & Co.*, 287 Mich. 340, 283 N.W. 603 (1939).

Indeed, the Revised Model Business Corporation Act and the Michigan Business Corporation Act as revised in 1989 each contain a single provision relating to distributions to shareholders and repurchases of shares by a corporation. Model Business Corp. Act Ann., § 6.40, at 474–75 (Prentice Hall 3d ed. Supp.1990); Michigan Act § 450.1345 (1989). In addition, the definition of "distribution" under the Michigan Act includes distributions by redemption or other acquisition of shares by a corporation. Michigan Act § 450.1106(3) (1989). Hence, the characterization of the exchange of each Old Revco share for $38.50 as both a repurchase of shares and distribution of cash appears reasonable.

Accordingly, it appears that the Merger could be viewed as a "purchase" or "redemption" by Old Revco of its own stock in violation of section 365.

### C. *Remedies*

Having concluded it is possible to state claims under the Michigan Act, it is necessary to consider what benefits can be derived from pursuing them.

#### 1. Against Directors

Under section 551(1)(a) of the Michigan Act, directors who vote for or concur in a declaration of a dividend or other distribution of assets to shareholders contrary to the Michigan Act without paying or adequately providing for the corporation's known debts, obligations and liabilities, are jointly and severally liable to the corporation for the benefit of its creditors and shareholders to the extent of any legally recoverable injury, up to the amount of the unlawful payment or distribution. The statute specifically provides, however, that a director is not liable under this section if

he complied with section 541 of the Michigan Act.

Section 541(1) of the Michigan Act states: A director or an officer shall discharge the duties of that position in good faith and with that degree of diligence, care and skill which an ordinarily prudent person would exercise under similar circumstances in a like position. In discharging his or her duties, a director or an officer, when acting in good faith, may rely upon the opinion of counsel for the corporation, upon the report of an independent appraiser selected with a reasonable case [sic] by the board, or upon financial statements of the corporation represented to him or her as correct by the president or the officer of the corporation having charge of its books of account, or stated in a written report by an independent public or certified public accountant or firm of accountants fairly to reflect the financial condition of the corporation.

It would be quite difficult to establish that Old Revco's directors did not comply with this provision. In Michigan, corporate directors and officers owe fiduciary duties of care and loyalty to the corporation and its shareholders. *Berman v. Gerber Prods. Co.*, 454 F.Supp. 1310, 1319 (W.D. Mich.1978); *Thomas v. Satfield Co.*, 363 Mich. 111, 108 N.W.2d 907 (1961). Under section 541 of the Michigan Act, these duties require that the directors and officers act in good faith and with the degree of diligence, care and skill which an ordinarily prudent person would exercise under similar circumstances in a like position.

A number of factors in this case tend to indicate that Old Revco's Board of Directors acted in good faith and with due care in determining that the Merger was in the best interests of Old Revco, including, *inter alia,* that (i) the Board appointed the Independent Committee to evaluate the Merger, (ii) the Independent Committee met frequently over an eight month period and was continually advised by Fried Frank and Goldman Sachs, two entities which have extensive experience and emi-

nent reputations in mergers, acquisitions and buyouts, (iii) the Independent Committee received a fairness opinion from Goldman Sachs, (iv) the Independent Committee received a "negative" comfort letter from Peat Marwick, and (v) the Independent Committee had several months in which to review the proposal. As the court said in *Estate of Detwiler v. Offenbecher*, 728 F.Supp. 103 (S.D.N.Y.1989) (construing Michigan law as guided by Delaware law), in connection with an action brought against directors for breach of fiduciary duty with respect to the sale of a corporation, "[p]laintiffs cite no case in which a party overcame the business judgment rule's protection where the sale of a company involved a special committee of outside directors, an investment banker, special counsel, an accounting firm, board meetings over eighteen months, and shareholder approval." *Id.* at 156.

Cases involving actions of directors of Michigan corporations in the takeover context indicate that directors do not generally owe a fiduciary duty to constituencies other than shareholders. As stated in one case, "[w]hen directors have determined that it is inevitable that the corporation be sold, as occurred here ... the directors' cardinal fiduciary obligation to the corporation and its shareholders is to ensure 'maximization of the company's value at a sale for the stockholders' benefit.'" *Plaza Sec. Co. v. Fruehauf Corp.*, 643 F.Supp. 1535, 1543 (E.D.Mich.), *aff'd sub nom. Edelman v. Fruehauf,* 798 F.2d 882 (6th Cir.1986), quoting *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 182 (Del.1986).

While no Michigan cases have been found which explicitly address the right of creditors to bring actions against directors for breach of fiduciary duty owed to *creditors* when a company is the subject of a takeover bid, Delaware courts have consistently refused to recognize the existence of fiduciary duties owed by a company to its creditors.[15] *See Simons v. Cogan,* 549

---

**15.** In the absence of Michigan law concerning a question of corporate law, the courts of Michigan have referred to Delaware law. *See, e.g., Russ v. Federal Mogul Corp.,* 112 Mich.App. 449,

A.2d 300 (Del.1988) (issuing corporation owed no fiduciary duty to convertible debentures holders); *Harff v. Kerkorian,* 324 A.2d 215 (Del.Ch.1974) (convertible debenture holders did not have standing as "stockholders" for purposes of maintaining a derivative action against directors for breach of fiduciary duty), *aff'd in part, rev'd in part,* 347 A.2d 133 (Del.1975) (affirming Chancery Court's holding that debenture holders lacked standing as "stockholders" but reversing court's decision that plaintiffs' class action failed to allege fraud).

While courts have recognized that circumstances can arise in a takeover context in which directors may legitimately consider the interests of creditors and other constituencies besides shareholders, in no cases found does an affirmative duty to non-shareholder constituencies exist. *See, e.g., Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946 (Del.1985); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 182, 184 (Del.1985); *Mills Acquisition Co. v. MacMillan, Inc.,* 559 A.2d 1261, 1282 n. 29 (Del.1989) (board may consider effect on "other constituencies" in assessing a bid).

Accordingly, substantial obstacles exist in sustaining an action and recovering damages against Old Revco's former officers and directors. Moreover, on a more practical level, the Examiner has been advised that no directors' and officers' liability insurance is in effect covering the officers and directors for such claims. Thus, it is doubtful that a recovery sufficiently substantial to justify the effort, expense and burdens associated with litigation could be obtained.

### 2. Against Shareholders

As far as recovery against shareholders is concerned, section 551(3) of the Michigan Act states that "[a] shareholder who accepts or receives a dividend or distribution with knowledge of facts indicating it is not authorized by [the statute] is liable to the corporation for the amount" accepted or received. The statute does not address exactly what facts must be known, whether

316 N.W.2d 454, 457 n. 1 (1982); *Plaza Sec. Co.,*

the full consequences and significance of the facts are required to be known, or how such knowledge of facts is to be established in order to impose liability. Thus, it is unclear whether a shareholder must merely know the facts of the transaction, must know of the Michigan statute, or must have specific actual knowledge that the transaction is unauthorized under the Michigan Act.

There do not appear to be any Michigan cases on point. The only cases found in similar contexts in other jurisdictions appear to involve closely held corporations in which the shareholders/defendants in question were clearly insiders who controlled the company and had full knowledge of all relevant facts which were transpiring. *See, e.g., England v. Christensen,* 243 Cal. App.2d 413, 52 Cal.Rptr. 402 (1966).

Interestingly, in *Wieboldt Stores v. Schottenstein,* 111 Bankr. 162 (N.D.Ill. 1990), the court discussed the level of knowledge required by the Illinois statute to enable a director to recover contribution from a shareholder who received an illegal distribution. The court found that the statute applies only to "shareholders who actually knew that the distributions which they accepted or received were improper." *Id.* at 162. The court also noted that "imposing contribution liability upon shareholders who had no actual knowledge of the impropriety of a corporate distribution would dampen the willingness of investors to purchase corporate stock." *Id.*

Thus, even if a cause of action were alleged under the Michigan Act, the ability to recover from shareholders is questionable. Also, in order to maintain the cause of action against the shareholders successfully, a court would have to apply Michigan law in a manner for which there does not seem to be any clear precedent.

Moreover, it appears that an action under the Michigan Act would involve a greater burden of proof than a fraudulent conveyance action, and would yield no greater recovery for the estate. This was recognized by the Michigan Court of Appeals in

643 F.Supp. at 1543 n. 5.

*Fireman's Fund Insurance Co. v. Harold Turner Inc.*, 159 Mich.App. 812, 407 N.W.2d 82 (1987). In granting summary disposition in favor of a plaintiff in an action brought under the Uniform Fraudulent Conveyance Act, the court observed:

> To recover from defendants as shareholders, plaintiff would have to prove defendants received distribution of [the corporation's] assets 'with knowledge of facts indicating that it was not authorized....' Neither of these provisions afford plaintiff as great an opportunity for relief as does § 4 of the UFCA, which only requires proof of a transfer rendering the person insolvent without fair consideration. A legal remedy cannot be said to give full and ample relief if its mode for obtaining relief is not as effectual as that which equity affords. [citation omitted] Equity has jurisdiction whenever it provides advantages not obtainable at law. [citation omitted] We conclude that the [Michigan Act] does not provide an ample alternate remedy.

159 Mich.App. 812, 407 N.W.2d at 83–84.

Thus, it appears that asserting claims against Old Revco's shareholders under the Michigan Act would add little, if anything, of substance to fraudulent conveyance claims. Since a fraudulent conveyance action may be commenced after the Michigan action has expired and a similar recovery may be obtained, there is little reason to pursue potential causes of action against shareholders under the Michigan Act. Coupled with the more substantial burden of proof under the Michigan Act and in view of the likely adverse effect that commencement of such an action would have on delicate plan negotiations, the Examiner does not recommend commencing an action against shareholders under the Michigan Act.

### 3. Statute of Limitations

Under section 554 of the Michigan Act, "[a]n action against a director or shareholder for recovery [under section 551] ... shall be commenced within three years after the cause of action accrues." Under section 541(2) of the Michigan Act, an action against a director or officer for failure to perform his or her duties diligently must be commenced within three years after the cause of action has accrued or within two years after the time the cause of action is or should have reasonably been discovered, whichever occurs first. Accordingly, absent the chapter 11 proceedings, these statutes of limitations would have expired on December 28, 1989. However, by virtue of section 108(a)(2) of the Bankruptcy Code, the actions are tolled for two years from the order for relief, and accordingly, must be brought by July 25, 1990.

### 4. Res Judicata and Collateral Estoppel

A major complication relating to the decision whether or not to assert the Michigan causes of action relates to the doctrine of *res judicata*, which provides that a final judgment on the merits is an absolute bar to a subsequent action between the same parties or those in privity with them upon the same cause of action. Under this doctrine, a judgment in the initial action prevents relitigation of all grounds for recovery that could have been asserted in support of the cause of action brought in the initial action, regardless of whether they were actually asserted. *See* 1B *Moore's Federal Practice* ¶ 0.405[1] (1990); *Mayer v. Distel Tool Mach. Co.*, 556 F.2d 798 (6th Cir.1977) (Michigan law); *White v. Colgan Elec. Co.*, 781 F.2d 1214 (6th Cir.1986) (Ohio law); *City of Canton v. Maynard*, 766 F.2d 236 (6th Cir.1985) (Ohio law); *Chambers v. Koehler*, 635 F.Supp. 884 (W.D.Mich.1984). Thus, as long as the grounds relate to a single cause of action, *res judicata* requires that they be asserted in one action.

While it is not entirely clear what constitutes one cause of action for the purposes of this doctrine, significant authority exists supporting the proposition that a plaintiff is required to present in one suit all the claims for relief that may exist which arise out of the same transaction or occurrence and are controlled by the same factual predicate. *See Expert Elec. Inc. v. Levine*, 554 F.2d 1227 (2d Cir.), *cert. denied*, 434 U.S. 903 (1977); C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 4407 (1981 & Supp.1990);

Restatement (Second) of Judgments § 24 (1982). If *res judicata* applies, the failure to pursue the fraudulent conveyance action at the same time as the Michigan action could result in the barring of the fraudulent conveyance action.

Even if a court were not to apply the doctrine of *res judicata,* a risk exists that the doctrine of collateral estoppel might apply. Under that doctrine, a final judgment constitutes an estoppel between the same parties and those in privity with them as to matters that were necessarily litigated and determined in the earlier cause of action. It has been held that a prior adjudication will give rise to an estoppel when the issue there determined (1) is identical to that involved in the subsequent action, (2) was actually litigated in the earlier action and (3) was necessary and essential to a final judgment on the merits. *United States v. One 1975 Chevrolet K–5 Blazer,* 495 F.Supp. 737, 741 (W.D.Mich.1980); *Spilman v. Harley,* 656 F.2d 224, 228 (6th Cir.1981). In both Ohio and Michigan, the issue in the prior proceeding and the later proceeding must be identical. *See, e.g., Zanders v. National O. R.R. Passenger Corp.,* 898 F.2d 1127 (6th Cir.1990) (Ohio law); *United States v. Sandoz Pharmaceuticals Corp.,* 894 F.2d 825 (6th Cir.1990) (Ohio law); *Chambers,* 635 F.Supp. at 888–89. A prior action, however, "[i]t is not conclusive as to questions which might have been but were not litigated in the original action." *Goldman v. Wexler,* 122 Mich.App. 744, 747, 333 N.W.2d 121, 122 (1983). Hence, if the court, for example, were to dismiss the initial action brought under the Michigan Act on the ground that Revco was not insolvent at the time of the transfer, such a finding as to Revco's insolvency might be binding on the parties to the initial action in any subsequent action asserting an alternative ground for recovery.

Given the foregoing, if the causes of action in the Michigan Act were asserted, because of the significant risk of the effects of the *res judicata* and collateral estoppel doctrines, it would, as a practical matter, be imprudent not to assert all other possible causes of action.

## VII. FRAUDULENT CONVEYANCE ISSUES

### A. *Introduction*

At this time, the Examiner is not prepared to conclude that actual fraud existed in connection with the Revco LBO. Because of the time constraints involved in preparing this Preliminary Report, further research on this issue remains to be done.

With respect to constructive fraud, the Examiner believes, based on his preliminary analysis, that there is evidence indicating that Revco was left with unreasonably small capital and likely was rendered insolvent as a result of the transaction. Consequently, the Examiner believes that a strong case exists for sustaining a fraudulent conveyance cause of action.

Having preliminarily concluded that a basis for a fraudulent conveyance action exists, the Examiner believes that it will be necessary to complete the analysis of available evidence which was not possible in the short time available between his appointment and the date set for the filing of this Preliminary Report. In addition, the Examiner's continued investigation must include further consideration of appropriate remedies and targets. As all parties appear to concur, there is no controlling authority or definitive guidance as to the appropriate remedies for fraudulent conveyances in this context. The Court has wide latitude in its ability to fashion an appropriate and equitable remedy. The Examiner's preliminary thoughts on such remedies are discussed herein.

### B. *Leveraged Buyouts as a Fraudulent Transfer*

#### 1. Applicability of Law in General

Although the majority of courts which have considered the issue have applied fraudulent conveyance law to leveraged buyouts, some courts have recognized legal commentators who have argued that the constructive fraud provisions of fraudulent conveyance laws should not be applied to leveraged buyouts. The Examiner has con-

sidered these latter views. Professors Baird and Jackson, for example, question the application of constructive fraud principles to leveraged buyouts. They argue that fraudulent conveyance statutes are descendents of sixteenth century laws enacted to prevent collusive transfers between debtors and their families and friends. Consequently, these statutes should be generally construed narrowly to invalidate only sham transactions and gratuitous transfers. Baird & Jackson, *Fraudulent Conveyance Law and Its Proper Domain*, 38 Vand.L.Rev. 829, 840 (1985). Baird and Jackson's thesis is that leveraged buyouts may be beneficial to the economy, and that application of constructive fraud principles to leveraged buyouts would discourage participants in highly leveraged transactions and thus deter a potentially beneficial activity. *Id.* at 854–55.

Professors Baird and Jackson contend that constructive fraud principles are inapplicable "even if it appears after the fact that the debtor's actions injured the creditors." *Id.* at 854. This argument is based on their view "that the debtor-creditor relationship is essentially contractual," *id.* at 835, and that creditors can protect themselves by adjusting the terms on which they grant credit.

Baird and Jackson maintain that "the inability of creditors to contract around the fraudulent conveyance remedy when it is in their interest may suggest that fraudulent conveyance law should be applied in bankruptcy to a narrow range of cases in which there is little chance that creditors would find the transfer in their interest." *Id.* at 854. Thus, it appears that Baird and Jackson would argue that a fraudulent conveyance could be invalidated only when there is a clear intent by the parties to the leveraged buyout to defraud the target's creditors.

Professor Carlson has also concluded that the applicability of the constructive fraud provisions to leveraged buyouts should be severely limited. *See* Carlson, *Leveraged Buyouts in Bankruptcy*, 20 Ga. L.Rev. 73 (1985). Professor Carlson argues that "transfers to the leveraged buyout lender should not, in retrospect, be deemed fraudulent conveyances simply because the target company subsequently required protection from creditors." *Id.* at 75. Moreover, Professor Carlson focuses upon the good faith defense available to lenders under section 548(c) of the Bankruptcy Code and maintains that a leveraged buyout should not be deemed fraudulent if the lender reasonably believed that the target would emerge solvent or would have "a fair chance to survive financially." *Id.* at 76. In his view, "[a] bankruptcy court should assess the leveraged buyout from the perspective of the time the lender transfer was made, without allowing itself to be influenced by subsequent history." *Id.* at 75. Accordingly, Professor Carlson asserts that:

> Only when the lender anticipates an upcoming liquidation that is prejudicial to general creditors should the LBO lender's rights be subject to fraudulent conveyance liability.

*Id.* at 76–77.

The Baird and Jackson view has been acknowledged favorably by a few courts. For example, in *Credit Managers Association of Southern California v. Federal Co.*, 629 F.Supp. 175 (C.D.Cal.1985), a leveraged buyout was attacked on the ground that, *inter alia*, it was a constructively fraudulent conveyance. In declining to overturn the leveraged buyout the court assumed, *arguendo*, that fraudulent conveyance law applies to leveraged buyouts, but nevertheless stated that:

> In analyzing plaintiff's claims, the court does not mean to suggest that it believes fraudulent conveyance law is generally and broadly applicable to leveraged buyouts. To the contrary, Baird & Jackson's article presents compelling arguments why it should not be.

*Id.* at 179.

Similarly, in *Kupetz v. Wolf*, 845 F.2d 842 (9th Cir.1988), the Ninth Circuit refused "to use the law of fraudulent conveyances to force the selling shareholders ... to give up payments they h[ad] received ... [where] there [was] no evidence of in-

tention on the part of selling shareholders to defraud the corporation's creditors." *Id.* at 847–48. The court continued:

> [W]e hesitate to utilize constructive intent to frustrate the purposes intended to be served by what appears to us to be a legitimate LBO. Nor do we think it appropriate to utilize constructive intent to brand most, if not all, LBOs as illegitimate. We cannot believe that virtually all LBOs are designed to 'hinder, delay, or defraud creditors.'

*Id.* at 848. The court acknowledged that leveraged buyouts should be subject to the intentional fraud provision of the Uniform Fraudulent Conveyance Act ("UFCA"). *Id.* at 846.

While the Examiner understands the public policy arguments set forth or referred to above and that, therefore, there is a risk in any fraudulent conveyance litigation that a court will find that fraudulent conveyance law should not apply to leveraged buyouts, given the current status of the relevant case law and existing statutes, the Examiner cannot conclude that fraudulent conveyance law does not apply to leveraged buyouts. Despite the sympathetic treatment in *Credit Managers* and *Kupetz* of leveraged buyouts attacked under the constructive fraudulent conveyance sections of the UFCA, the applicability of the statutory constructive fraud provisions to leveraged buyouts has been accepted by the majority of courts that have considered the issue.

For example, in *United States v. Tabor Court Realty Corp.,* 803 F.2d 1288, 1297 (3d Cir.1986), *cert. denied,* 483 U.S. 1005 (1987), the court found, *inter alia,* that the leveraged buyout at issue violated the Pennsylvania UFCA. In response to the defendants' contention that the statute, which was enacted in 1924, should not be applied to leveraged buyouts, the court stated:

> The Act's broad language, however, extends to any 'conveyance' which is defined as 'every payment of money ... and also the creation of any lien or encumbrance.' 39 Pa.Stat. § 351. This broad sweep does not justify exclusion of

a particular transaction such as a leveraged buy-out simply because it is innovative or complicated. If the UFCA is not to be applied to leveraged buy-outs, it should be for the state legislatures, not the courts, to decide.

803 F.2d at 1297.

Likewise, in *Wieboldt Stores v. Schottenstein,* 94 Bankr. 488 (N.D.Ill.1988), a fraudulent conveyance action was brought against all the participants in a leveraged buyout, including lenders, former shareholders, directors and officers of the target company. The defendants moved to dismiss the complaint alleging, *inter alia:*

> (1) that applying fraudulent conveyance laws to public tender offers effectively allows creditors to insure themselves against subsequent mismanagement of the company;
>
> (2) that applying fraudulent conveyance laws to LBO transactions and thereby rendering them void severely restricts the usefulness of LBOs and results in great unfairness; and
>
> (3) that fraudulent conveyance laws were never intended to be used to prohibit or restrict public tender offers.

*Id.* at 499.

In denying for the most part the motion to dismiss, the court stated:

> Although some support exists for defendants' arguments [based on Baird and Jackson's analysis], this court cannot hold at this stage in this litigation that the LBO in question here is entirely exempt from fraudulent conveyance laws. Neither Section 548 of the Code nor the Illinois statute exempt such transactions from their statutory coverage. Section 548 invalidates fraudulent 'transfers' of a debtor's property. Section 101(50) [of the Bankruptcy Code] defines such a transfer very broadly to include 'every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest.' 11 U.S.C. § 101(50). Likewise, the Illinois statute applies to gifts, grants, conveyances, assignments and transfers. Ill.Rev.Stat. ch. 59, ¶ 4. The language of

these statutes in no way limits their application so as to exclude LBOs.

94 Bankr. at 499.

In *Ferrari v. Barclays Business Credit (In re Morse Tool, Inc.)*, 108 Bankr. 389 (Bankr.D.Mass.1989), the court considered whether future creditors of the debtor had standing to assert a fraudulent conveyance action under the Massachusetts UFCA. The court examined a number of policy considerations raised by courts and commentators for not applying fraudulent conveyance laws to leveraged buyouts:

> [L]everaged buy-outs ... will be discouraged if the courts apply fraudulent conveyance laws to them indiscriminately; that leveraged buy-outs are not the kinds of transactions that fraudulent conveyance laws (neither 13 Eliz. ch. 5 nor the Uniform Fraudulent Conveyance Act) were intended to deter and remedy; that creditors can protect themselves from leveraged buy-outs by ... contracting to prohibit them; and that future creditors who extend[ ] credit knowing of the buy-out should not be able to use fraudulent conveyance laws as insurance policies for failed LBOs.

*Id.* at 390–91.

The court, however, stated:

> These arguments have some merit, but so do the counterarguments: for example, that not all leveraged buy-outs have social utility or benefit for creditors, and fraudulent conveyance laws may help deter or redress the worst of them; that few creditors have the bargaining power to prevent the debtor from engaging in an LBO; that many trade creditors and other future creditors do not and cannot, in the normal course of business, perform a solvency or cash-flow analysis of the debtor before extending credit; and that involuntary future creditors (such as taxing authorities and tort creditors) do not have freedom to decide whether to extend credit to the target of an LBO.

*Id.* at 391. *See also In re Ohio Corrugating Co.*, 70 Bankr. 920 (Bankr.N.D.Ohio 1987); *Anderson Indust., Inc. v. Anderson (In re Anderson Indust., Inc.)*, 55 Bankr. 922 (Bankr.W.D.Mich.1985); *Vadnais Lumber Supply v. Byrne (In re Vadnais Lumber Supply)*, 100 Bankr. 127 (Bankr. D.Mass.1989); *Kaiser Steel Corp. v. Jacobs (In re Kaiser Steel Corp.)*, 87 Bankr. 154 (Bankr.D.Colo.1988).

### 2. Application of Fraudulent Conveyance Law to the Revco LBO

Having determined that fraudulent conveyance law can apply to leveraged buyouts, one must next review the fact patterns presented when courts have applied fraudulent conveyance law to leveraged buyouts to determine whether causes of action arise from the Revco LBO. An analysis of the recent cases in which leveraged buyouts have been attacked as fraudulent conveyances confirms that courts are becoming increasingly aggressive in applying fraudulent conveyances to a wide variety of facts and circumstances.

The first reported in-depth analysis of the applicability of fraudulent conveyance law to a leveraged buyout is found in *United States v. Gleneagles Investment Co. Inc.*, 565 F.Supp. 556 (M.D.Pa.1983), *aff'd sub nom., United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.1986), *cert. denied*, 483 U.S. 1005 (1987). In that case, the target of a leveraged buyout and certain of its affiliates borrowed funds and granted the lender a security interest in all of their assets. During the loan negotiations, fraudulent conveyance concerns were specifically discussed. The loan proceeds were used to (a) satisfy a pre-existing secured debt of one of the target's affiliates in order to free encumbered assets to secure the leveraged buyout debt to the lender (such debt was guaranteed by the target's principals), (b) provide an interest reserve for the lender, and (c) provide a loan to the purchaser, who then used the funds to purchase the target's stock. The transaction was challenged in an action brought by the United States government to collect delinquent taxes. The court found that both actual and constructive fraud existed. That finding was upheld by the Third Circuit.

In *Wieboldt Stores v. Schottenstein*, 94 Bankr. 488 (N.D.Ill.1988), a holding compa-

ny was created which obtained financing from a lender which enabled it to purchase 99% of the target corporation's stock through a tender offer. The target became liable on an amended note to the lender, and pledged substantially all of its assets to the lender as collateral for the obligations to the lender. The lender was aware that the loan proceeds were to be used primarily to finance the tender offer and to pay off certain pre-existing debts. Within a year subsequent to the transaction, the bankruptcy proceeding commenced. As debtor in possession, the target filed a complaint, attacking the leveraged buyout as a fraudulent conveyance based upon the actual and constructive fraud provisions of both Illinois law and the Bankruptcy Code. Defendants included the lenders, the target's former officers and directors, controlling shareholders, and those former shareholders who owned and tendered more than 1,000 shares of Wieboldt common stock.

The court denied the defendants' motion to dismiss and found that the debtor had alleged sufficient facts to establish a fraudulent conveyance claim against the lenders, the controlling shareholders and the controlling or insider shareholders. The court rejected the notion that the shareholders who tendered 1,000 shares or more, and were unaware of the financing source, were subject to attack in this case, and dismissed the claims against them.

One of the more significant aspects of *Wieboldt* is the court's refusal to analyze the leveraged buyout as technically distinct transactions. Rather, the court created a hypothetical reality by collapsing the transactions as to the lenders, insider shareholders and controlling shareholders, thereby applying the fraudulent conveyance statute to the substance of the transaction. The court refused to allow the parties to be shielded from potential liability arising from the transactions by the form of the transactions. In reaching this result, the court stated:

> The complaint alleges clearly that these participants in the LBO negotiations attempted to structure the LBO with the requisite knowledge and contemplation

that the full transaction, tender offer and LBO, be completed. The Board and the insider shareholders knew that WSI intended to finance its acquisition of Wieboldt through an LBO ... and not with any of its own funds. They knew that Wieboldt was insolvent before the LBO and that the LBO would result in further encumbrance of Wieboldt's already encumbered assets.... Attorneys for Schottenstein Stores apprised the Board of the fraudulent conveyance laws and suggested that they structure the LBO so as to avoid liability.... Nonetheless, these shareholders recommended that Wieboldt accept the tender offer and themselves tendered their shares to WSI.

> Wieboldt's complaint also alleges sufficient facts to implicate the LBO lenders in the scheme. [The lenders] were well aware of each other's loan or credit commitments to WSI and knew that WSI intended to use the proceeds of their financing commitment to purchase Wieboldt shares or options and to release certain Wieboldt assets from prior encumbrances.... Representatives of the lenders received the same information concerning the fraudulent conveyance laws as did the Board of Directors.... These LBO lenders agreed with WSI and the Board of Directors to structure the LBO so as to avoid fraudulent conveyance liability.

*Id.* at 502–503.

The *Wieboldt* court refused, however, to "collapse" the transaction in relation to the non-insider shareholders who held and tendered more than 1,000 shares. The court stated:

> While Wieboldt directs specific allegations of fraud against the controlling and insider shareholders and LBO lenders, Wieboldt does not allege that the Schedule A shareholders were aware that WSI's acquisition encumbered virtually all of Wieboldt's assets. Nor is there an allegation that these shareholders were aware that the consideration they received for their tendered shares was Wieboldt property. In fact, the complaint does not suggest that the Schedule A

shareholders had any part in the LBO except as innocent pawns in the scheme. They were aware only that WSI made a public offer for shares of Wieboldt Stock. *Id.* at 503. Although the particular distinction drawn between shareholders by the court was whether the shareholders were insiders/controlling shareholders, the practical distinction was whether those shareholders were aware of the overall leveraged buyout transaction and its financial structure. The *Wieboldt* court refused to collapse the transaction with respect to the non-insider, non-controlling shareholders and recognized that they had a good faith defense under Bankruptcy Code section 550(b). Arguably, institutional shareholders who were aware of the components of the deal may be unable to satisfy the good faith requirement. Consequently, it would not be inconsistent with *Wieboldt* to recognize an action against knowledgeable shareholders.

The *Wieboldt* court also found that the complaint sufficiently pleaded actual fraud by alleging that the lenders and controlling or insider shareholders structured the leveraged buyout transaction in such a way as to attempt to evade fraudulent conveyance liability. *Id.* at 504.

The court also addressed the issue of whether there was fair equivalent value under the fact pattern presented by the *Wieboldt* case. The court found constructive fraud was sufficiently pleaded because equivalent value was not transferred, and the target was rendered insolvent by the leveraged buyout. *Id.* at 505. The *Wieboldt* court rejected the contention that the stock acquired by the target from the shareholders constituted fair equivalent value for the obligations incurred by the target. The court found that regardless of the price of the shares on the open market, this stock had no value to the target and its creditors. Based upon this analysis, it appears that selling shareholders who are deemed to have benefitted from a fraudulent conveyance could be compelled to disgorge the entire amount realized on their shares.

In *Ohio Corrugating Co. v. Security Pacific Business Credit (In re Ohio Corrugating Co.),* 70 Bankr. 920 (Bankr.N.D. Ohio 1987), the creditors' committee brought an action alleging, among other things, that the transfer by the debtor of a security interest for purposes of a leveraged buyout was an actual and constructive fraudulent conveyance under section 548 of the Bankruptcy Code and the UFCA. Defendants moved for summary judgment arguing, *inter alia,* that "as long as some entity received a reasonably equivalent value for the incurring of the loan obligation or the transferring of a security interest, Plaintiff's case must fail regardless of whether [the debtor] benefitted from the transaction." *Id.* at 927. Although the court granted summary judgment on the actual fraud allegations, the court rejected the defendants' argument on constructive fraud and wrote:

> An analysis of an allegedly fraudulent transfer must be directed at what the Debtor surrendered and what the Debtor received, irrespective of what any third party may have gained or lost. The rationale of the fraudulent transfer provision of the Code is to preserve the assets of the estate.

*Id.*

It is readily apparent that many close parallels exist between the Revco LBO and the cases finding leveraged buyouts to be fraudulent conveyances. For example, if the Revco LBO were collapsed, Revco would be viewed as a mere conduit of the proceeds of the Revco LBO financing, which were paid immediately to the Old Revco shareholders. Consequently, when the Revco LBO is viewed from the perspective of Revco's creditors, Revco incurred more than $1.1 billion of additional debt for which it is liable and for which it derived no benefit.

Additionally, based upon the preliminary analysis of his financial advisors, the Examiner has reason to believe that Revco was, as a result of the Revco LBO, left with unreasonably small capital. For example, in the context of the transaction's actual capital structure, utilization of the

sales growth and operating margin assumptions used in several of the later projections made available to the Examiner results in:

(a) Revco's failure to meet certain scheduled principal payments on the Term Loan;

(b) Revco's failure to generate cash sufficient to meet cash maturity and sinking fund payments on the Subordinated Notes; and

(c) numerous projected financial covenant violations throughout the life of the Loan Agreements.

Furthermore, the severity of the immediate post-transaction cash crisis alluded to earlier in this Preliminary Report and memorialized in Wilbur Smith's internal memorandum dated January 2, 1987 (less than one week after the Revco LBO was consummated), is indicative of unreasonably small capital. The Examiner continues to investigate whether Revco was insolvent immediately after the Revco LBO.

The Examiner's preliminary analysis suggests that claims can be asserted against the Banks and the holders of the Subordinated Notes, both of whom financed the transaction with full knowledge of all relevant facts and circumstances. Moreover, the shareholders of Old Revco who received $38.50 for each of their Old Revco shares can be targets as well. There are, however, a number of legal and factual areas which must be investigated in greater detail in order to permit the Examiner to determine the appropriate targets and remedies of fraudulent conveyance litigation. Among the elements to be considered in further depth are:

1. The identity and composition of Old Revco's shareholders. The key to this analysis would be the extent to which the shares were held by sophisticated, institutional shareholders having both an understanding of the transaction and sufficient resources to satisfy a judgment, as opposed to individual shareholders who may have limited means are scattered in numerous locations. The Examiner has been led to believe that as much as 70% of the Old Revco shares were held by institutional investors who might well have had full knowledge and understanding of the facts and circumstances surrounding the Revco LBO. The Examiner has been unable, however, to confirm this information;

2. Whether shareholders who actively participated in structuring and implementing the Revco LBO were cognizant of the material aspects of the transaction, and whether they should be distinguished from public shareholders; and

3. The projections and assumptions upon which the transaction was based in order to assess more precisely how reasonable it was to proceed with the transaction as structured. The Examiner has found considerable evidence attesting to the fact that there may well have been serious doubts as to the viability of the transaction as it was being implemented and believes it is imperative to pursue these areas further.

## C. Remedies in a Fraudulent Conveyance Action

There is no authority offering definitive guidance on the remedies that are available or appropriate in this case. Accordingly, if the Revco LBO were found to be a fraudulent conveyance, a court would be presented with a unique opportunity to fashion an appropriate and equitable remedy. It would, of course, not be in the best interest of the estates to bring a fraudulent conveyance claim unless a remedy exists which would yield significant benefits to a material constituency. The Examiner believes that this aspect of the analysis represents by far the most critical and challenging issue.

A simple and mechanical application of fraudulent conveyance statutes to a transaction such as the Revco LBO may not result in appropriate remedies. It is possible that parties could be left substantially in the same positions they now occupy, or that a relatively small constituency could receive a limited benefit disproportionate to the time and expenditure of the estates' assets required to pursue the cause of action. The Examiner believes, however,

that a court has the ability to fashion a more meaningful remedy. While the discussion below analyzes and suggests possible remedies, the Examiner believes that considerably more time and attention must be devoted to this area to ensure the thorough and proper consideration of this issue.

The analysis of remedies logically begins with the statutes. Under section 9 of the UFCA,[16] a creditor who establishes the existence of a fraudulent conveyance and whose claim has matured, may have the transfer set aside (or the obligation annulled) and the transferred property recovered to the extent necessary to satisfy the claim. Alternatively, a creditor may disregard the conveyance and attach or levy execution upon the property as though the disposition had never occurred. UFCA § 9(a)(b). Section 10 of the UFCA allows a creditor whose claim has not matured to proceed as though his claim has matured. The statute authorizes a court to restrain the defendant from disposing of the property, to appoint a receiver to take charge of the property, to set aside the conveyance or annul the obligation, or to make any order the circumstances may require. As one commentator has stated, however:

> Neither section, . . . establishes in certain terms the full panoply of remedies available to the aggrieved creditor but, instead, effectively leaves the complainant to the remedies generally available to creditors in the state that provides the governing law; that is, the UFCA fixes the effect of a fraudulent conveyance, but the consequences that flow therefrom are a matter for other supplementary state law.

Alces, *The Law of Fraudulent Transactions* ¶ 5.01[4][a][i] (1989).

By contrast, section 548(a) of the Bankruptcy Code states only that the trustee "may avoid any transfer of an interest of the debtor in the property, or any obli-

gation incurred by the debtor. . . ." 11 U.S.C. § 548(a). This offers little guidance, on a practical basis, as to the scope of available remedies.[17]

In general, fraudulent conveyance statutes protect creditors from transfers of property or obligations incurred which are intended to impair the creditors' rights to payment or which deplete assets or increase obligations of a financially impaired debtor. The creditors' remedy (or a bankruptcy trustee's remedy on behalf of creditors) is to avoid the transfer or obligation and to recover the property or its value from transferees. *See, e.g., Julien J. Studley, Inc. v. Lefrak,* 66 A.D.2d 208, 412 N.Y.S.2d 901 (2d Dep't), *aff'd,* 48 N.Y.2d 954, 401 N.E.2d 187, 425 N.Y.S.2d 65 (1979) (officer/director who received corporation's assets in fraudulent conveyance held those assets as a constructive trustee in favor of the creditors of a corporation); *Pereira v. Checkmate Communications Co. (In re Checkmate Stereo & Elecs.),* 9 Bankr. 585 (Bankr.E.D.N.Y.1981), *aff'd,* 21 Bankr. 402 (E.D.N.Y.1982) (transactions unwound to extent possible by allowing the trustee to recover assets transferred to defendants); *In re Otis & Edwards,* No. 82–03508–G (Bankr.E.D.Mich. Jan. 2, 1990) (1990 Bankr. LEXIS 107) (security interest in debtor's assets voided; trustee entitled to recover all monies already transferred by the debtor to the transferee; stock transferred to debtor returned to original owner); *Ear, Nose & Throat Surgeons v. Guaranty Bank & Trust Co. (In re Ear, Nose and Throat Surgeons),* 49 Bankr. 316, 320–21 (Bankr.D.Mass.1985) (corporate debtor's guaranty and security interest of bank loan to corporation's president were fraudulent conveyances and were set aside as null and void).

The majority of fraudulent conveyance cases in the leveraged buyout area do not

---

**16.** In 1984, the Uniform Law Commissioners approved a new Uniform Fraudulent Transfer Act, 7A U.L.A. 639 ("UFTA"). The UFTA has not been adopted by Ohio and does not appear to govern the Revco LBO.

**17.** Both the UFCA and the Bankruptcy Code have "savings provisions" which provide a safe

harbor for good faith purchasers who took for value. In those situations, the transfer is not voidable against such transferees. *See* UFCA section 9(2); Bankruptcy Code sections 548(c), 550. *cf., Wieboldt Stores v. Schottenstein,* 94 Bankr. at 488.

provide much help in deciding what remedies are available. A summary of the relevant cases is helpful, however, to appreciate the direction in which the courts appear to be headed. In *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.1986), *cert. denied*, 483 U.S. 1005 (1987), the court held that a mortgage which was deemed to be a fraudulent conveyance could be set aside, notwithstanding that it had been assigned to a third party who had paid other creditors. The court said:

> "[I]f we extract from the fraudulent actors every advantage which they derived from their fraud and restore the creditor to the position which lawfully belonged to it at the time the fraud was perpetrated and give it all rights which, but for the fraud, it had under the law, we feel that equity would adequately be done."

*United States v. Tabor Court Realty Corp.*, 803 F.2d at 1301 (quoting *Newman v. First Nat'l Bank*, 76 F.2d 347, 350 (3d Cir.1935)). The Court of Appeals affirmed the district court's determination that only by voiding the entire amount could justice be done. *Id.* at 1301.

Certain cases have found that improper payments made by a debtor either to selling shareholders or lenders must be disgorged. In *Vadnais Lumber Supply v. Byrne (In re Vadnais Lunder Supply)*, 100 Bankr. 127 (Bankr.D.Mass.1989), a corporation purchased its own shares from four shareholders for $100,000 and paid an additional $300,000 for the selling shareholders' limited covenants not to compete. The court held that the cash paid to the shareholders and the obligations for future installment payments incurred by the corporation were fraudulent transfers under the Bankruptcy Code. *Id.* at 137. The court discharged the debtor from all obligations to make future payments and allowed the debtor to recover all cash payments made at or after the closing. *Id.* at 141.

*Mellon Bank v. Metro Communications (In re Metro Communications)*, 95 Bankr. 921 (Bankr.W.D.Pa.1989), involved a corporation that was purchased by a shell corporation in a leveraged buyout. The shell corporation received a loan from a bank to finance the purchase of the target's stock. The loan was guaranteed and secured by all of the present and future assets of the target. The target also received a working capital loan, which the shell corporation guaranteed. The target ultimately filed for bankruptcy, and the bank sought a determination of its secured status. The committee of unsecured creditors intervened seeking to avoid the transfers to the bank as preferential payments or fraudulent conveyances.

The *Mellon* court held that the granting to the bank of a security interest in the target's assets constituted a preferential transfer and was void. The court ordered that any payments made to the bank with the target's funds must be disgorged by the bank. In addition, the court entered an order declaring that the original leveraged buyout transaction among the parties be avoided as a fraudulent transfer. The court did not state, however, in what manner the transfer should be avoided.

Traditionally, leveraged buyouts have been analyzed from two possible perspectives. One approach is to analyze and test each component of the leveraged buyout separately against fraudulent conveyance law. The more modern view is to ignore the form of the transaction and test the substance of the transaction as a whole against fraudulent conveyance law. The Examiner believes that the latter method can result in some novel remedies which yield substantial benefits to the estates.[18]

### 1. Analysis by Components

Under this approach, each transfer comprising part of the Revco LBO would be viewed as a separate transaction. If so analyzed, most aspects of the financing of the transactions appear to be for adequate consideration and not subject to a fraudulent conveyance challenge. Old Revco received $455 million in consideration of its incurring obligations with respect to the Term Loan Agreement. Merger Sub re-

---

**18.** This entire discussion assumes the absence of actual fraud.

ceived more than $700 million in consideration of its issuing the Subordinated Notes. On its face, the Merger appeared to be a traditional combination of assets and liabilities of constituent corporations. However, even when the various elements of the financing of the Revco LBO are viewed as entirely separate, certain aspects of the transaction may be subject to fraudulent conveyance attack.

For example, Old Revco paid significant fees to the Agents and their representatives to procure the funds. Since Old Revco may have received no direct benefit from these funds, arguably these fees can be recovered as fraudulent conveyances.

An entity which receives a loan regardless of its need for such funds cannot refute the receipt of the funds. Consequently, incurring an obligation in such amount must be considered to be for fair consideration. A borrower may be compelled to pay a fee as a premium to assure acquisition of the loan. If the debtor does not actually need the money, however, fees paid to the lender as a premium for obtaining such funds do not represent a value to the debtor and may be considered a fraudulent conveyance. Payment of fees to the Banks may, therefore, have been a fraudulent transaction.

Even if payment of lenders' fees were avoided, it is unclear that there would be any meaningful benefit from the avoidance. Under the subordination provisions of the indentures pursuant to which the Subordinated Notes were issued, upon any distribution to creditors in a bankruptcy, reorganization or similar proceeding, the Banks are entitled to receive payment in full of all principal, premium, interest, fees, and other amounts due in connection with the Loan Agreements before holders of the Subordi-

nated Notes are entitled to receive any payment of principal or interest or any other distributions (except for securities subordinated to the Banks to at least the same extent as the Subordinated Notes).[19]

The stock repurchase itself is another separate component. After Old Revco and Merger Sub were merged, the surviving entity acquired the outstanding Old Revco shares for $38.50 per share. Arguably a stock repurchase provides no value to the purchasing corporation in a fraudulent conveyance context. If this is so, Old Revco shareholders would be required to disgorge the entire $38.50 per share they received in the Merger. However, in view of the practical difficulties in pursuing all shareholders, this remedy might well be restricted to more sophisticated shareholders.

If the Old Revco shareholders were required to disgorge the cash they received, they might be entitled to receive an equivalent equity interest in Revco. It is not entirely clear how such shareholders' interests would be related to Anac's equity interest in Revco.

The critical issue in analyzing this approach is which parties would benefit from a successful fraudulent conveyance attack, and whether the benefits of pursuing the action would justify the cost, expense and disruption to the estates. Because there is a significant amount of subordinated debt, which would probably not be fully satisfied absent a large recovery from all former shareholders, it is questionable whether Revco would become solvent after an action against only the shareholders. If Revco did not become solvent, then the non-leveraged buyout debtholders would probably not be entitled to post-petition interest, or otherwise to recover more than the full value of their claims. Assuming fraudu-

**19.** The indentures require that any distributions to which holders of the Subordinated Notes would otherwise be entitled, but for the requirement set forth in the preceding sentence, must be made to holders of senior debt (including the Banks). Accordingly, if any or all payments to the Banks are set aside as fraudulent conveyances, the holders of the Subordinated Notes would be required to pay over to the Banks the amounts avoided, if the indentures are strictly interpreted. While our research did not uncover any cases directly on point, the cases generally hold that subordination agreements are enforceable in bankruptcy, absent some ambiguity in the language which makes it difficult to determine whether the situation is covered by the provision in question. *See, e.g., Gould v. Levin (In re Credit Indus. Corp.),* 366 F.2d 402, 407–09 (2d Cir.1966). If this is the result, there would seem to be little benefit to the estates or any creditors generally from avoiding payments to the Bank.

lent conveyance litigation were commenced which postponed recovery for several years, the present value of their recovery would be significantly less than 100%. If the estate were not rendered solvent by the recoveries, the Subordinated Noteholders would likely be the only parties which might benefit significantly from a successful fraudulent conveyance action. However, the Examiner notes that according to financial projections which he has reviewed, the estate would only need to recover on less than half of the shares to become solvent.

### 2. Analysis of the Substance of the Revco LBO

As discussed, a number of courts have suggested that one should analyze the substance of a leveraged buyout transaction rather than the form to determine whether there was a fraudulent conveyance. Thus, for example, the *Wieboldt* court collapsed all components of that complex leveraged buyout into a single transaction, with the net result being analyzed from a fraudulent conveyance perspective. In such an analysis, when valuing items being transferred, the valuation must be made from the perspective of the creditors of each transferee.

By collapsing the steps of the Revco LBO, Revco itself could be viewed as a mere conduit of funds which were used to purchase shares of Old Revco for Anac. Under this view, Revco received no fair equivalent value for either incurring the leveraged buyout obligations or encumbering its assets. Arguably, these obligations could be avoided. Alternatively, even if one were to argue that Revco did receive a benefit from the LBO financing, then, as discussed above, it received no benefit from redeeming the Old Revco shares and would be entitled to avoid that transaction. In either event, Revco would be entitled to a single satisfaction representing the approximately $1.2 billion which flowed through its coffers without providing any benefit to Revco. Reviewing this theory in more detail results in the following analysis.

Once the Revco LBO is collapsed, the conclusion flows logically that the Banks

and the Old Revco shareholders received consideration from Revco for which Revco derived no benefit. Similarly, Revco incurred obligations to the Banks and Subordinated Noteholders for which it received no benefit.

In addition to the remedies against shareholders which have been discussed, once the transaction is collapsed, there would also be a remedy against the Revco LBO lenders. Both *Wieboldt* and *Gleneagles* suggest that a target's liability on the obligations to the leveraged buyout lenders may be avoided as fraudulent transfers.

Further support for the cancellation of the obligations of Revco to the Banks and to the Subordinated Noteholders may be found in the language of the Ohio fraudulent transfer statute. While the UFCA indicates that an obligation may be avoided in certain fraudulent conveyance actions, the reference to "obligations" is inexplicably omitted from section 5 (unreasonably small capital). Ohio has adopted a non-uniform amendment adding "obligations" to section 5 of the Ohio UFCA. As a matter of statutory interpretation, this non-uniform amendment suggests that the Ohio legislature intended that an obligation may be deemed unenforceable to the extent that it is incurred for less than fair consideration when the obligor is rendered insolvent, is left with unreasonably small capital or is unable to pay its debts as they mature. If the obligation is incurred for no consideration, arguably the obligation should be entirely unenforceable.

Avoidance of the Revco LBO obligations would significantly benefit the holders of the non-LBO debt, such as the trade creditors. If the liabilities on the Subordinated Notes and Bank debt were removed, Revco would become a solvent entity. The non-LBO creditors would, therefore, be entitled to be repaid outstanding principal, as well as post-petition interest.

While at first blush, avoidance of the Revco LBO obligations might seem draconian, it is possible to create remedies that do not wholly extinguish the claims. Arguably, the claims could be asserted against Anac. The Banks would become senior

secured creditors of Anac pursuant to Anac's guaranty of the Bank debt. Anac, as the sole shareholder of a solvent Revco, would likely be able to repay the Banks.

The Subordinated Notes are not guarantied by Anac. If Revco were released of its obligation on the Subordinated Notes, however, the holders might assert an unjust enrichment action against Anac, alleging that Anac's acquisition of Revco shares resulted directly from Anac's use of the funds advanced by the Subordinated Noteholders. While the Examiner has not yet fully studied the prospects of success of this cause of action, one possible result is that the Subordinated Notes would become an obligation of Anac, subordinated to the Bank debt both because of the Banks' security interest in Anac's assets and the subordination provisions applicable to the Subordinated Notes. The Subordinated Notes would remain senior to the equity holders of Anac.

If the Banks' claim against Revco is annulled, to the extent that the Banks have received post-petition payments from Revco, those payments would have to be disgorged. As a practical matter, however, because Revco would have sufficient funds to satisfy the non-LBO debt without these funds, such recovery from the Banks would ultimately redound to the benefit of Revco's shareholder, Anac. Since the Banks would be treated as senior secured creditors of Anac, and pursuant to the subordination arrangements, the Banks would ultimately recover such funds.

Similarly, if Revco's obligations to the Banks were released, those interest payments received by the Banks from Revco prior to the bankruptcy filing would no longer have been in satisfaction of enforceable obligations, and would also be fraudulent transfers. Once again, however, any recovery would likely be returned to the Banks as senior secured creditors of Anac and pursuant to the subordination arrangements.

Finally, if the Banks' claims against Revco were not avoided, but the Banks' security interests were deemed unenforceable, any payment on Revco's obligation to the Banks during the year prior to the Filing Date might be deemed a preference. Although the Banks may not be considered an insider of Revco to trigger the one year insider preference period set forth in section 547(b)(4)(B) of the Bankruptcy Code, the insider preference period may nonetheless be operative under the *Deprizio* doctrine, since all payments to the Banks benefitted another Revco insider, Anac, as guarantor of the Bank debt. *See, e.g., Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1194–97 (7th Cir.1989); *Lowrey v. First Nat'l Bank (In re Robinson Bros. Drilling)*, 97 Bankr. 77, 79–82 (Bankr.W.D. Okla.1988), *aff'd sub nom. Manufacturers Hanover Leasing Corp. v. Lowrey (In re Robinson Bros. Drilling)*, 892 F.2d 850 (10th Cir.1989); *Ray v. City Bank & Trust Co. (In re C–L Cartage Co.)*, 899 F.2d 1490, 1494–95 (6th Cir.1990). Such preferential payments would be a substantial sum, considering the payments to the Bank resulting from the significant asset disposition program undertaken prior to the bankruptcy filing. Once again, however, due to the subordination arrangements, once the non-LBO debt is satisfied in full the Banks would receive any amounts they were compelled to disgorge.

Regardless of the remedy employed, the Subordinated Noteholders might seek recovery directly from the Old Revco selling shareholders. Analysis of such a cause of action is beyond the scope of this report.

Absolving the estate of its obligations to the Banks and the Subordinated Noteholders would constitute a complete remedy. Alternatively, compelling the selling shareholders to disgorge the $38.50 per share that they received would constitute a complete remedy. Pursuant to section 550(c) of the Bankruptcy Code, "(t)he trustee is entitled to only a single satisfaction under subsection (a) of this section." 11 U.S.C. § 550(c). Subsection (a) includes fraudulent conveyance actions commenced pursuant to section 544 of the Bankruptcy Code. *Id.* at § 550(a). Therefore, Revco is not entitled to a double recovery. It appears, however, that Revco could recover partially from the Revco LBO lenders and partially

from selling shareholders as long as the recovery does not exceed a single satisfaction.

### 3. Another Approach to Analyzing Substance over Form

Two significant problems permeate the remedies already discussed. First, the Examiner is unaware of any case in which the debt has been entirely cancelled as a fraudulent conveyance. There are cases in which guaranties and security interests have been set aside, but the remedies suggested above appear to go beyond what courts have done so far in a leveraged buyout context. Second, fashioning a remedy which would require proceeding against Old Revco shareholders, even if limited to those that are insiders or knowledgeable institutional shareholders, could well represent a cumbersome, time-consuming and enormously expensive undertaking. Even if it were possible to obtain judgments against many of the shareholders, there can be no assurances at this stage that significant recoveries would result.

Accordingly, the Examiner believes it would be far preferable to fashion a remedy which accomplishes the same results while avoiding these two problems. The Examiner preliminarily is considering one approach that might accomplish this objective. At the present time only the outlines of an approach have been developed. Nevertheless, the Examiner believes that it may be useful to suggest ideas that can perhaps be developed further by the parties or can aid the parties in resolving this matter.

The spirit of the *Wieboldt* case is to attempt to pierce through the form of a complex transaction to discern its substance. The *Wieboldt* court chose to do this by collapsing the various components of the entire transaction; however, that approach is problematic with respect to the facts of the Revco LBO. The Examiner believes that a different approach is necessary to reflect the substance of the Revco LBO. As already noted, the case law endorses a creative approach to achieve the equitable result of ordering priorities by putting the parties back where theoretically they would have been but for the fraudulent conveyance. To reiterate what was noted in *Tabor Court Realty:*

> "[I]f we extract from the fraudulent actors every advantage which they derived from their fraud and restore the creditor to the position which lawfully belonged to it at the time the fraud was perpetrated and give it all rights which, but for the fraud, it had under the law, we feel that equity would adequately be done."

*United States v. Tabor Court Realty Corp.,* 803 F.2d 1288, 1301 (3d Cir.1986), *cert denied,* 483 U.S. 1005 (1987), quoting *Newman v. First National Bank,* 76 F.2d 347, 350 (3d Cir.1935).

The underlying justification for challenging a leveraged buyout as a fraudulent transfer is that the transaction effectively converts equity to debt and prejudices the target's existing creditors. Accordingly, to promote the intent of fraudulent conveyance principles, the logical remedy would be one which effectively restores the parties to the positions in which they would have been if the fraudulent conveyances had not occurred, while attempting to minimize restructuring the transaction beyond the parties' expectations. At the same time, the Examiner is sensitive to the concern of avoiding a windfall to those entities who were parties to the questionable transactions at the expense of innocent victims.

One way this could be accomplished is to analyze the components of the merger on a segregated basis, and attempt to deal with them accordingly. The object of this approach is to attempt to restore all parties to their original positions prior to the challenged transactions, in accordance with the stated policy underlying fraudulent conveyances cases.

The Merger transaction can be viewed as a two-step process. The first step was the combination of Merger Sub and Old Revco into one corporate entity. The second step was the "acquisition" of shares of Old Revco. Related to the Merger transaction were two financing transactions. In one, Old Revco borrowed from the Banks under the Term Loan Agreement, receiving cash of $455 million. The other was the is-

suance by Merger Sub of approximately $700 million of Subordinated Notes, for which it received cash.

The net effect of these transactions could be characterized by concluding that Revco effectively transferred all its assets to Merger Sub and received nothing but extensive liabilities in return. Arguably, rather than unwinding the entire Revco LBO, the appropriate remedy is to relieve Revco of the obligations it inherited by operation of the Merger and to return the constituents to their respective original states.

To accomplish this goal, conceptually the Merger would have to be "unwound" and reconstituted. A hypothetically created Merger Sub would be viewed once again as a wholly-owned subsidiary of Anac.[20] Its assets would consist of shares of the hypothetically reconstituted Old Revco. The Subordinated Notes would be liabilities of Merger Sub, the entity which originally incurred the obligation. This would relieve Old Revco of any responsibility for the $700 million of Subordinated Notes, and thus, render Old Revco solvent. The Bank debt would remain an obligation of Old Revco. At this stage, because Old Revco would be viewed as solvent, all remaining creditors could be paid in full with post-petition interest.

After these transactions are theoretically unwound, the result would be that Merger Sub would be a wholly-owned subsidiary of Anac. Merger Sub and Anac would be the sole shareholders of Old Revco. Merger Sub would be the only entity liable on the Subordinated Notes. Old Revco would be a solvent corporation having assets valued at close to $1 billion. Its major liabilities would be the trade debt and the $455 million of Bank debt.

Under this theoretical construct, it is not necessary to pursue the former Old Revco shareholders, because, all of the Old Revco shares would have been acquired in one of the following ways:

1. Old Revco purchased its shares at a time when it was solvent, and it remained solvent thereafter;

2. Merger Sub purchased Old Revco shares in a market transaction with the funds it received from issuing the Subordinated Notes; and

3. Anac exchanged Anac shares in consideration of the Management Transfer Shares.

The primary purpose of this analysis is to offer a framework for establishing priorities which will serve as the foundation of an appropriate remedy. The Examiner recognizes that physically unwinding the transactions as discussed above would be impractical; however, without establishing such an analytical foundation, an appropriate equitable remedy cannot be structured.

Accepting this analytic framework, the priorities in any Revco distribution would be as follows:

1. The Banks would receive full payment of principal and interest.

2. Unsecured general creditors would receive principal plus interest, given that Revco could be viewed as a solvent entity.

3. Merger Sub and Anac would receive equity in Revco in proportion to their interests as holders of Old Revco's common stock. Anac's interest would be represented by the Management Transfer Shares. Merger Sub's interests would be measured by the proportion of Old Revco equity which could have been purchased by the proceeds of the Subordinated Notes. For purposes of developing those proportions of ownership interests, shares which could have been purchased with the proceeds of the Term Loan are excluded.

4. With respect to a distribution of Merger Sub's assets, holders of Sub-

---

**20.** Technically, there were various other intermediate subsidiaries; however, since they were utilized primarily for tax planning purposes, they can be ignored for the purpose of this analysis. The Examiner has not yet had an opportunity to review whether the initial capitalization of the intermediate subsidiaries created any causes of action for fraudulent conveyance.

ordinated Notes would have a first claim against Merger Sub's assets. Any remaining assets would go to Anac, as Merger Sub's sole shareholder.

While the Examiner is not at this stage prepared to endorse any particular remedy definitively, it would appear that fashioning a remedy based upon the priorities achieved through the preceding analysis would be consistent with the intent underlying remedies fashioned in prior case law and would yield a significant benefit to the estates at the least possible cost, while avoiding inequitable results and cumbersome defendant class action litigation.

The Examiner intends to pursue this theory further, because he believes that if the theory can be translated to a practical application, a court would achieve the same result of putting substance over form as collapsing the leveraged buyout in *Wieboldt* did, but would avoid certain of the difficulties. While the non-LBO creditors would be the sole beneficiaries of these remedies, the court would not be compelled to take the drastic measure of cancelling debt. In addition, it would be unnecessary to pursue former shareholders. The court and the estates would thereby avoid the complex legal issues, time and expense involved in determining which shareholders are liable and to what degree, as well as the practical problem in pursuing numerous parties to recover funds. While the Examiner recognizes that this approach might be novel, he believes that it deserves serious consideration.

## VIII. EQUITABLE SUBORDINATION

Section 510(c) of the Bankruptcy Code permits the Court to use the doctrine of equitable subordination to balance the equities among claims of creditors and to offset the harm done to other creditors when a creditor has engaged in fraudulent or inequitable conduct.[21] 11 U.S.C. § 510(c).

As articulated by the Fifth Circuit in 1977, the test for applying this doctrine to a particular claim is:

(i) The claimant must have engaged in some type of inequitable conduct[;]

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant[; and]

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699–700 (5th Cir.1977) (citations omitted). *See also Anaconda–Ericsson, Inc. v. Hessen (In re Teltronics Services, Inc.)*, 29 Bankr. 139, 168 (Bankr. E.D.N.Y.1983); *Pinetree Partners v. OTR (In re Pinetree Partners)*, 87 Bankr. 481, 488 (Bankr.N.D.Ohio 1988).

When the creditor/claimant is not an insider, "egregious conduct must be proven with particularity. It is insufficient for the party objecting in such cases merely to establish sharp dealings; rather, he must prove that the claimant is guilty of gross misconduct tantamount to fraud, overreaching or spoliation to the detriment of others." *In re Pinetree Partners*, 87 Bankr. at 488; *Anaconda–Ericsson, Inc. v. Hessen (In re Teltronics Services, Inc.)*, 29 Bankr. at 169; *See In re W.T. Grant Co.*, 4 Bankr. 53, 74–76 (Bankr.S.D.N.Y.1980), *aff'd*, 20 Bankr. 186 (S.D.N.Y.1982), *aff'd*, 698 F.2d 61 (2d Cir.1983).

When faced with attempts equitably to subordinate bank debt, commentators note that courts generally only do so (1) if they find fraud, or (2) if the bank has exercised sufficient control over the debtors so that it owes a duty to the debtor and its other creditors and has breached that duty. Chaitman, *The Equitable Subordination of Bank Claims*, 39 Bus.Law. 1561, 1562 (1984).

The investigation to date has not uncovered evidence sufficient to conclude that

---

**21.** While the statute does not provide any guidelines by which equitable subordination may be applied, courts are "to follow existing case law and continue to develop the principles of the doctrine of equitable subordination on a case by case basis." *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 109 Bankr. 186, 192–93 (Bankr.S.D.Miss.1987) (citing 124 Cong.Rec.H11,095 (daily ed. Sept. 28, 1978); *Id.* at S17, 412 (daily ed. Oct. 6, 1978)).

the Banks engaged in fraudulent conduct or exercised sufficient control over the debtors such that the Banks' claims would be subject to the doctrines of equitable subordination. Likewise, the investigation to date has not revealed any evidence to suggest that the Banks engaged in inequitable conduct sufficient to give rise to a claim of equitable subordination. Although the Loan Agreements contain stringent provisions, it is unlikely that a court would find the loan provisions alone to be a sufficient basis to invoke the doctrine of equitable subordination. *See Smith v. Associates Comm. Corp (In re Clark Pipe & Supply Co.)*, 893 F.2d 693, 702 (5th Cir. 1990). Thus, the Examiner is uncertain about the viability of a claim for equitable subordination.

## IX.   OTHER CAUSES OF ACTION

There are a number of causes of action which the Examiner and his advisors have begun to investigate which do not relate to the essence of the Revco LBO to the same extent as those previously discussed, but nevertheless clearly involved matters arising from the Revco LBO. The preliminary analysis of these causes of action is set forth below in this section.

### A.   *Dworkin Unwind*

As previously noted, when the board of directors became disenchanted with management, Sidney Dworkin, Mark Dworkin and William B. Edwards entered into the Dworkin Unwind. As part of the Dworkin Unwind, Anac redeemed 1,155,000 shares of Anac stock held by Sidney Dworkin at a value of $6.946 per share, the same price paid by the Investor Group when the Revco LBO was consummated. The Examiner hopes to be able to evaluate with the help of his financial advisors whether the redemption price paid by Anac was reasonably equivalent to the value of the stock; since, the financial condition of Revco, and thus the assets of its parent Anac, had significantly deteriorated since the Revco LBO.

Part of the consideration paid by Anac to Dworkin consisted of assets which were valued at the time of the transfer. These included 1,000 shares of GIFL held by Revco, which were valued at their book value; shares of GCC, which were valued by computing the average of the closing ask price and the closing bid price on September 21, 1987, and then reducing the aggregate value by 15%; the transfer of a condominium in New York City from a subsidiary of Anac ("Sopco") for considerably less than either the initial cost of the condominium or the mortgage which had previously been on the property; the transfer of condominium furnishings and office furniture from Sopco for considerably less than their purchase price; and the transfer of cars from Sopco for considerably less than their fair market value according to the National Automobile Dealer Association "blue book." In addition, cash consideration flowed to the Dworkins and Edwards as more fully outlined previously. These included payments for pension benefits, lump sum severance, legal and accounting fees and office space for the Dworkins. As additional consideration, Sidney Dworkin received a lifetime 15% discount card at Revco.

In order for Anac to effect the stock redemption, assets were delivered to the Dworkins from both Revco and Sopco. In addition, to facilitate the Dworkin Unwind, Revco upstreamed $5 million to Anac at a time when it appears it may have had insufficient capital to conduct its business.

The resolution of the legal issues raised by the Dworkin Unwind may result in numerous causes of action against the Dworkins and Edwards with a potential aggregate benefit to the estates of $8 to 12 million. The Examiner is reviewing these further and intends to make a recommendation in a future report as to whether litigation should be commenced, and if so, whether the litigation should be commenced as part of the overall fraudulent conveyance litigation, as a separate litigation, or the causes of action assigned to a litigation trust to help fund the payment of claims pursuant to a consensual plan of reorganization. Some of the legal issues raised by the Dworkin Unwind are discussed briefly below.

First, from the Examiner's investigation to date, it would appear that Revco up-streamed millions of dollars to Anac to accomplish the stock redemption at a time when Revco was either insolvent or had unreasonably small capital to operate its business. Revco apparently did not receive any equivalent value. The Examiner is investigating whether this transaction constituted either an illegal dividend to Revco's shareholder, Anac, or a fraudulent transfer to Anac. If the latter is the case, the Examiner will consider whether Anac has any assets with which to satisfy a judgment before recommending whether or not Revco should bring litigation against Anac. The Examiner is also attempting to review the role of Sopco in the transfers to Dworkin.

Second, there is a question whether the lump sum compensation prepaid to the Dworkins and Edwards could constitute either fraudulent conveyances or preferential transfers. There is substantial authority that payments made under an employment termination agreement may be fraudulent + transfers. See *Joshua Slocum, Ltd. v. Boyle (In re Joshua Slocum Ltd.)*, 103 Bankr. 610 (Bankr.E.D.Pa.1989) (employment termination after leveraged buyout; employee sold back stock and received other payments and insurance); *Consove v. Cohen (In re Roco Corp.)*, 701 F.2d 978 (1st Cir.1983) (stock redemption); *Murphy v. Robinson (In re Ipswich Bituminous Concrete Prods.)*, 79 Bankr. 511 (Bankr.D. Mass.1987) (stock redemption); *Flanigan v. De Feo (In re De Feo Fruit Co.)*, 24 Bankr. 220 (Bankr.W.D.Mo.1982) (stock redemption). All of the cases analyzed involve closely-held corporations which were smaller than Anac and Revco, however, which may be grounds for distinguishing the cases.

A number of cases which address payments made to officers pursuant to an employment termination agreement in the context of a fraudulent conveyance also discuss the possibility that these payments constituted a preference under section 547 of the Bankruptcy Code. *See, e.g., In re Joshua Slocum Ltd.*, 103 Bankr. at 626; *In re Roco Corp.*, 701 F.2d at 984–85. In the instant case, the Dworkins and Edwards, who had certainly been insiders of Revco up until their termination, received a lump sum payment for the antecedent obligation of Revco to pay them severance over a period of two years. This lump sum was paid within a year of the Revco filing. These facts suggest that the payments may be avoided as preferential transfers.

Finally, with respect to the severance payments, it is noted that during the months from September of 1987 through March of 1988, both of the Dworkins and Edwards stayed on the Revco payroll while the severance agreement was being negotiated and documented. During this time, they were asked to perform minimal services for Revco, if any. Therefore, there is a question of whether Revco received fair equivalent value in return for the salaries it paid to these three individuals during that six-month period. The Examiner will review further whether these salary payments can be avoided as fraudulent transfers.

It is believed, although the Examiner has not yet been able to verify the fact, that certain of the payments to the Dworkins and Edwards were contributions to those individuals' pension plans. Although research does not provide a case which addresses a debtor's payment to an individual's pension plan, in at least one case a preference was recovered where an employer made a payment to its group pension plan within the ninety-day period prior to bankruptcy. *Pulaski Highway Express v. Central States Southeast & Southwest Areas Health & Welfare & Pension Funds (In re Pulaski Highway Express)*, 41 Bankr. 305, 312 (Bankr.M.D.Tenn.1984). In permitting the debtor to recover the payment as a preference, the bankruptcy court reviewed the specific provisions of ERISA and found that ERISA did not supersede section 547 of the Bankruptcy Code. *Id.* at 308. If the payments constituted contributions to a pension plan, it may be possible to recover payments to the Dworkins and Edwards as preferences.

The next issue is whether the stock redemption as a whole was illegal and there-

fore recoverable by Anac. As Anac is incorporated in the State of Delaware, it is necessary to review the Delaware General Corporation Law to address Anac's redemption of its shares from Dworkin. Under section 160(a)(1) of the Delaware General Corporation Law, a Delaware corporation may not:

> Purchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation....

Del.Code Ann. tit. 8, § 160(a)(1) (1983).

While the term "impaired" is not defined in the statute, it is discussed in the case law. In *In re International Radiator Co.*, 92 A. 255 (Del.Ch.1914), the court stated:

> As here used, [impairment of capital] means the reduction of the amount of the assets of the company below the amount represented by the aggregate outstanding shares of the capital stock of the company. In other words, a corporation may use only its surplus for the purchase of shares of its own capital stock. "Capital" does not in this connection mean the assets of the company, for, of course, the assets are reduced when any of it is used by a corporation to purchase shares of its own capital stock. It must have some other meaning then. The statute must mean, therefore, that the funds and property of the company shall not be used for the purchase of shares of its own capital stock when the value of its assets is less than the aggregate amount of all the shares of its capital stock. A use by a corporation of its assets to purchase shares of its own capital stock under such conditions impairs the capital of the company.

*Id.* at 256; *see also Ashman v. Miller*, 101 F.2d 85 (6th Cir.1939).

In *Stanley v. Brock (In re Kettle Fried Chicken of America)*, 513 F.2d 807 (6th Cir.1975), the *International Radiator* case was discussed in the context of a trustee's suit against former shareholders to recover the funds paid to repurchase the debtor's shares. The Sixth Circuit, interpreting De-laware law, noted that there was no authority to determine whether to use book value or actual value in measuring assets for the purpose of determining whether the capital was impaired at the time of the stock redemption. In that case, the court found that the corporation's capital was impaired under both tests, and required the shareholders to refund the payments they received from the debtor. The Examiner will need to obtain further financial information concerning Anac to determine if an illegal stock redemption took place.

Finally, the Examiner notes that some of the stock and most of the hard assets transferred to the Dworkins was transferred at book value. From the information which the Examiner has been able to obtain, it appears that in most cases the book value was well below the fair market value. In addition, certain fees were paid for services provided to the Dworkins which did not benefit Revco or Anac at all. As a result, there is a question whether the transferor received fair equivalent value. Further examination is likely to show that each of these transfers constituted a fraudulent conveyance.

While each individual cause of action against the Dworkins and Edwards may not be sufficient to justify the expense of litigation in and of itself, when all the causes of action are put together in one complaint, it could amount to a sizeable recovery for the estate. The Examiner is therefore looking into these matters further to determine whether the expense of litigation is justified.

B. *Recovery of Fees as Fraudulent Conveyances*

On or about the closing of the LBO, Revco paid fees in excess of $70 million to the Agents and various professional firms and advisors, as well as a number of other fees. In many cases, it would appear that the recipient of the fees was not directly retained by Revco, rendered services to some entity other than Revco, or did not confer a benefit on Revco sufficient to withstand a fraudulent conveyance attack. While additional investigation is required

before definitive conclusions can be drawn, the Examiner believes that viable causes of action can be asserted for recovering a substantial portion of these fees on one or more of the theories set forth below.

A number of cases exist supporting the proposition that a payment by a debtor of an obligation of a third party can be set aside as a fraudulent conveyance if the debtor receives no benefit from the entity receiving the payment. *See Smiley Professional Assoc. v. Phelps (In re O'Bannon)*, 484 F.2d 864 (10th Cir.1973) (payments by the individual principals of a corporation of a fee to an attorney for initiating bankruptcy proceedings on behalf of the corporation recovered by the individuals' trustee in bankruptcy); *Gill v. Brooklier (In re Burbank Generators, Inc.)*, 48 Bankr. 204 (Bankr.C.D.Cal.1985) (recovery of fees paid to an attorney representing one of the debtor's employees who was prosecuted for racketeering); *Barr v. Weber (In re Carousel Candy Co.)*, 38 Bankr. 927 (Bankr.E.D.N.Y.1984) (attorney who represented the debtor pre-petition and another who represented the debtor post-petition were ordered to return their fees which were improperly obtained from the proceeds of the sale of the debtor's assets).

Other cases demonstrate that when the debtor does receive a benefit (even if indirect), and the benefit constitutes reasonably equivalent value to the debtor, no fraudulent conveyance exists. *See In re Burbank Generators*, 48 Bankr. at 206–207; *Bloor v. Dansker (In re Investors Funding Corp.)*, 523 F.Supp. 533 (S.D.N.Y. 1980) (issue of whether a professional failed to meet professional standards in rendering services involved a claim for malpractice, not fraudulent conveyance).

Based on the foregoing, Revco should be able to recover, as fraudulent transfers, fees it paid to professionals, advisors and others for which it received no benefit. Because the Examiner's legal and factual analysis of the relevant issues in this area is not yet complete, the Examiner considers it inappropriate at this point to specify which entities would likely be the defendants in any such litigation. Prior to issuing his final report, the Examiner intends to explore this area more fully and make more specific recommendations.

### C. *Other Professional Liability Claims*

In addition to recovering fees for services from which the debtors received no benefit, the Examiner has identified a number of theories on which professionals could be held liable for rendering services improperly. Such liabilities may be based on theories of negligence, breach of contract, fraud or aiding and abetting fraud. Among the possible defendants in such cause of action would be attorneys, accountants, investment bankers and appraisers. As was the case with respect to claims to recover fees paid as fraudulent conveyances discussed above, the Examiner believes that additional factual and legal analysis and investigation is required before definitive conclusions can be drawn and specific recommendations made.

### D. *Destruction of Documents*

The Examiner is currently investigating allegations that certain professionals have improperly destroyed work papers or other documents. If the allegations are true, the debtors may well be able to assert claims for damages or other sanctions. Additionally, it is possible that such actions constituted a violation of 18 U.S.C. § 152, which prohibits, among other things, knowingly and fraudulently destroying or concealing documents relating to the affairs of an entity which is a debtor in a bankruptcy proceeding. The Examiner feels it is inappropriate to be more specific at this juncture pending receipt of additional information.

### X. FACTS YET TO BE REVIEWED

Due to the enormous time constraints imposed on the Examiner in filing this Preliminary Report, it was not possible to commence investigation of anything but the most critical issues in any meaningful fashion. Among the remaining issues are analysis of intercorporate guaranties and grants of security interests. The Revco

LBO involved a number of guaranties and grants of security interests given to support the obligations of an affiliate. These transactions were made in favor of both the Banks and Schein and Steris. To the extent such transactions involved security interests given, for Revco's obligations, by a Revco Subsidiary now in bankruptcy, those guaranties or security interests might be unenforceable. Prior to making any recommendations, however, the Examiner must conduct a thorough analysis of the various assets and liabilities of each Revco Subsidiary to determine whether the benefit to the estate justifies commencing any action.

Additionally, pursuant to the indenture under which they were issued, the Pre–LBO 11¾% Debentures received equal and ratable security with the Banks under the Collateral Trust Agreement. In lieu of receiving such security, the Pre–LBO 11⅛% Notes received a flat payment and an increase in interest rate from 11⅛% to 12⅛%. Schein and Steris also received security and guaranties from Anac, Revco and the Revco Subsidiaries pursuant to the terms of the Carter–Glogau Agreement. The Examiner is in the process of investigating whether any of these transactions could be avoided as fraudulent conveyances, and will make recommendations upon completion of his analysis.

There are a number of possible claims which the Examiner intends to investigate and discuss in future reports. Among other causes of action which could possibly be brought under the circumstances are those relating to lender liability and grounds for objecting to the allowance of claims against the estates.

## XI.  CONCLUSION

The Examiner has attempted to address the most urgent issues facing the estates which arise from the Revco LBO as definitively as possible within the time constraints of this Preliminary Report and to reach tentative conclusions with respect to other issues. The Examiner shall continue his investigation and report further to the Court as quickly as possible consistent with providing a thoroughly investigated, well-reasoned analysis of the issues. The Examiner welcomes the input of all parties in interest.